IN THE SUPREME COURT OF NORTH CAROLINA

No. 374A14

Filed 21 December 2016

KAYE W. FISHER, DAN LEWIS and DANIEL H. LEWIS FARMS, INC., GEORGE ABBOT, ROBERT C. BOYETTE and BOYETTE FARMS, INC., KYLE A. COX, C. MONROE ENZOR, JR., Executor of the Estate of CRAWFORD MONROE ENZOR, SR., ARCHIE HILL, KENDALL HILL, WHITNEY E. KING, CRAY MILLIGAN, RICHARD RENEGAR, LINWOOD SCOTT, JR. and SCOTT FARMS, INC., ORVILLE WIGGINS, ALFORD JAMES WORLEY, Executor of the Estate of DENNIS ANDERSON, CHANDLER WORLEY, HAROLD WRIGHT, and OTHERS SIMILARLY SITUATED

v.

FLUE-CURED TOBACCO COOPERATIVE STABILIZATION CORPORATION

Appeal pursuant to N.C.G.S. § 7A-27(b) from an amended order on motion for class certification entered on 24 February 2014 by Judge John R. Jolly, Jr. in Superior Court, Wake County. On 10 October 2014, pursuant to N.C.G.S. § 7A-31(a) and (b)(2), and Rule 15(e)(2) of the North Carolina Rules of Appellate Procedure, the Supreme Court on its own initiative certified the case for review prior to determination in the Court of Appeals. Heard in the Supreme Court on 20 April 2015.

*Blanchard, Miller, Lewis & Isley, P.A., by Philip R. Isley; Speights & Runyan, by C. Alan Runyan, pro hac vice; and Richardson, Patrick, Westbrook & Brickman, LLC, by James L. Ward, Jr., for plaintiff-appellees.*

*Quinn Emanuel Urquhart & Sullivan, LLP, by John B. Quinn, pro hac vice, and Derek L. Shaffer, pro hac vice; and Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene and Tobias S. Hampson, for defendant-appellant n/k/a U.S. Tobacco Cooperative, Inc.*

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester, for NC Chamber, amicus curiae.*

JACKSON, Justice.

In this case we consider whether the trial court erred by allowing plaintiffs' motion to certify a class of current and former flue-cured tobacco producers who were members of defendant Flue-Cured Tobacco Cooperative Stabilization Corporation between 1946 and 2004. Because we cannot conclude that the trial court abused its discretion, we affirm and remand.

This appeal arises from two cases that were consolidated for pretrial purposes. These two cases began with the filing of complaints on 6 January 2005 and 11 February 2005. Plaintiffs are current and former tobacco producers and members of defendant, a nonprofit cooperative that administered the federal tobacco price support program (the Price Support Program) for flue-cured tobacco from 1946 through 2004.

According to the allegations in plaintiffs' third amended and consolidated complaint, flue-cured tobacco producers participating in the Price Support Program were required to be members of defendant. To become a member, a producer paid five dollars to defendant in exchange for one share of defendant's stock. The complaint asserted that each member entered into a contract with defendant that stated:

> The undersigned grower of flue-cured tobacco (hereinafter
> "grower") applies for membership in the Flue-Cured
> Tobacco Co-operative Stabilization Corporation, a non-

> profit co-operative . . . and herewith makes payment of $5.00 to the undersigned agent for one (1) share of common stock.
>
> The grower hereby appoints the Association as his agent to receive, handle and market all or such portion of the flue-cured tobacco . . . as the grower may elect or choose to deliver to the Association for disposition in accordance with the terms of this contract and the Association accepts such appointment . . . .
>
> The Stabilization Corporation agrees (1) to receive, handle and sell . . . such tobacco as the grower may elect to deliver to the Stabilization Corporation, and (2) that in addition to the amount of [sic] paid to the grower upon delivery of tobacco, it will distribute to him his pro rata share of any net gains remaining after payment of operating and maintenance costs and expenses and a reasonable deduction for reserves as determined by the Board of Directors.

The complaint asserts that each member "was guaranteed a lifetime membership in [defendant] that could not be cancelled without a hearing."

According to the complaint, the process of participating in the Price Support Program involved tobacco producers delivering their product to a warehouse, where defendant then graded the tobacco and attempted to sell it at auction. The auction was subject to a minimum price established annually by the United States Department of Agriculture, and the tobacco would not be sold for less than that price. If the tobacco could not be sold, then defendant would process and store it, while advancing the minimum price less an administrative fee to the tobacco producer. Defendant paid the tobacco producers using loans from the Commodity Credit

Corporation (CCC), a corporation owned and operated by the federal government that helped administer the Price Support Program. The unsold tobacco served as collateral for the loans issued by the CCC.

Plaintiffs' complaint alleged that until 1982, these loans "were completely non-recourse, meaning that all losses or defaults incurred under the program were borne by the CCC and the taxpayers of the United States." At the same time, if tobacco from a given crop year eventually was sold at a price higher than necessary to pay that year's loans, then "these gains were to be allocated pro-rata among [ ] the [tobacco producers] who participated in the program that year." This system of allocating losses and gains remained in effect until 1982, when Congress enacted the No Net Cost Tobacco Program Act (the NNC Act). Pursuant to the NNC Act, defendant began collecting an additional payment (the NNC Assessment) from tobacco producers when they delivered their tobacco to defendant. These funds served as additional collateral for the loans issued to defendant by the CCC, limiting losses borne by the federal government. If any funds remained after the loans were repaid, the surplus funds belonged to the tobacco producers who had participated in the Price Support Program. Ultimately, the Price Support Program came to an end in 2004.

Plaintiffs asserted claims related to funds accumulated by defendant throughout the lifetime of the Price Support Program and held by defendant as

reserve funds. According to the allegations in the complaint, the money in defendant's reserve funds came primarily from a few specific sources. First, defendant received and stored tobacco from 1967 to 1973 and eventually sold the tobacco at a price higher than necessary to repay the loans from the CCC for those crop years. Some of this surplus money was distributed to the tobacco producers, and some was retained by defendant as reserve funds. Defendant issued certificates of interest to the tobacco producers whose tobacco had created the surplus during this time period. The certificates of interest showing that the tobacco producers had an interest in the reserve funds were issued on a pro rata basis. Second, after 1982 defendant used surplus funds collected from NNC Assessments to redeem unsold tobacco that had been held as collateral for loans from the CCC. Defendant sold that tobacco for a substantial amount and retained the money as reserve funds. Third, when the Price Support Program came to an end in 2004, defendant satisfied its remaining loans, and the CCC returned to defendant approximately eighty-three million pounds of processed tobacco that had been held as collateral. Defendant sold this tobacco and again retained the revenue.

Plaintiffs' complaint alleged that in 2004, defendant notified all its members that unless they entered into new contracts to sell tobacco exclusively to defendant in 2005, they would lose their memberships—thus "forc[ing] Plaintiffs to either enter into that contract, at reduced prices and quantities, or lose their substantial investment in [defendant], including their share of the reserves, retained earnings,

and margins." Plaintiffs contended that defendant "expelled hundreds of thousands" of members and took control of the reserve funds in an "attempt[ ] to create a 'last man standing' scenario in which a few hundred remaining member[s] potentially have the benefit of hundreds of millions of dollars in assets which have been created through the efforts of all member[s], including Plaintiffs." Plaintiffs sought, *inter alia*, money damages, partial distribution of defendant's assets, and a declaratory judgment that plaintiffs are members of defendant and are "entitled to all rights, privileges, and benefits resulting" from their membership.

Plaintiffs also filed a motion for class certification. The trial court allowed the motion, stating that the certified class shall include:

> All individuals, proprietorships, partnerships, corporations, or their heirs, representatives, executors or assigns, and other proper entities that have been members/shareholders of the Flue-Cured Tobacco Cooperative Stabilization Corporation . . . at any time from its inception through the end of crop year 2004, and any heirs, representatives, executors, successors or assigns, and;
>
> (a) had not requested cancellation of their membership and whose membership was cancelled by Stabilization without a hearing, and/or
>
> (b) were issued a certificate of interest in capital reserve by Stabilization for any of the tobacco crop years between and including 1967-1973, and/or
>
> (c) delivered, consigned for sale, or sold flue-cured tobacco and paid an assessment for deposit into the No Net Cost Tobacco Fund or No Net Cost Tobacco Account during

any tobacco crop years between and including 1982-2004.

Defendant appealed to the North Carolina Court of Appeals. This Court on its own initiative certified the case for discretionary review prior to a determination by the Court of Appeals.

As an initial matter, we note that defendant's appeal is interlocutory. "Ordinarily, an appeal from an interlocutory order will be dismissed as fragmentary and premature unless the order affects some substantial right and will work injury to [the] appellant if not corrected before appeal from final judgment." *Oestreicher v. Am. Nat'l Stores, Inc.*, 290 N.C. 118, 125, 225 S.E.2d 797, 802 (1976) (quoting *Stanback v. Stanback*, 287 N.C. 448, 453, 215 S.E.2d 30, 34 (1975)). "A substantial right is 'a legal right affecting or involving a matter of substance as distinguished from matters of form: a right materially affecting those interests which [one] is entitled to have preserved and protected by law: a material right.' " *Gilbert v. N.C. State Bar*, 363 N.C. 70, 75, 678 S.E.2d 602, 605 (2009) (alteration in original) (quoting *Oestreicher*, 290 N.C. at 130, 225 S.E.2d at 805). "We consider whether a right is substantial on a case-by-case basis." *Id.* at 75, 678 S.E.2d at 605.

"The *denial* of class certification has been held to affect a substantial right because it determines the action as to the unnamed plaintiffs." *Frost v. Mazda Motor of Am., Inc.*, 353 N.C. 188, 193, 540 S.E.2d 324, 327 (2000) (citing, *inter alia*, *Perry v. Cullipher*, 69 N.C. App. 761, 762, 318 S.E.2d 354, 356 (1984)). "[H]owever, no order

*allowing* class certification has been held to similarly affect a substantial right such that interlocutory appeal would be permitted." *Id.* at 193, 540 S.E.2d at 328. In *Frost* we stated that a trial court's order allowing class certification does not affect a substantial right and is not immediately appealable. *Id.* at 194, 540 S.E.2d at 328. Nevertheless, we concluded that the underlying subject matter of *Frost* was important enough to justify invocation of our supervisory authority over the courts of this state to consider the merits of the appeal. *Id.* at 195, 540 S.E.2d at 329 (citing N.C.G.S. § 7A-32(b) (1999)).

The case *sub judice* involves "a class of producers of flue-cured tobacco who were members/shareholders of Defendant at times material and signed marketing agreements with Defendant pursuant to which the putative class members delivered tobacco to Defendant that was either sold or otherwise used in the [Price Support] program." The class includes the tobacco producers, "proprietorships, partnerships, [and] corporations," and their "heirs, representatives, executors, successors or assigns." The trial court stated that, according to defendant's records, "for each year between 1967 and 1973 certificates were issued to between 40,768 and 149,483 members," and "[t]here were 209,186 members who paid [NNC] assessments between 1982 and 2004." The parties agree that the total number of past and present members of defendant exceeds eight hundred thousand. Consequently, after careful consideration, we conclude that the subject matter of this case implicates the public interest to such a degree that invocation of our supervisory authority is appropriate.

N.C.G.S. § 7A-32(b) (2015). Accordingly, we consider the merits of defendant's appeal notwithstanding that the appeal is interlocutory and ordinarily would not be immediately appealable.

Rule 23 of the North Carolina Rules of Civil Procedure authorizes class action lawsuits, stating: "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued." N.C.G.S. § 1A-1, Rule 23(a) (2015). "The party seeking to bring a class action under Rule 23(a) has the burden of showing that the prerequisites to utilizing the class action procedure are present." *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 282, 354 S.E.2d 459, 465 (1987) (footnote and citation omitted). As an initial matter, the class representatives must demonstrate the existence of a class. *Id.* at 277, 280-81, 354 S.E.2d at 462, 464. "Whether a proper 'class' under Rule 23(a) has been alleged is a question of law." *Id.* at 280, 354 S.E.2d at 464. A proper class exists "when the named and unnamed members each have an interest in either the same issue of law or of fact, and that issue predominates over issues affecting only individual class members." *Id.* at 280, 354 S.E.2d at 464. In addition to establishing the existence of a proper class, the class representatives must show: (1) that "they will fairly and adequately represent the interests of all members of the class;" (2) that they have "no conflict of interest" with the class members; (3) that they "have a genuine personal interest, not a mere technical interest, in the outcome of the case;" (4) that they "will

adequately represent members outside the state;" (5) that "class members are so numerous that it is impractical to bring them all before the court;" and (6) that "adequate notice" is given to all class members. *Faulkenbury v. Teachers & State Emps.' Ret. Sys.*, 345 N.C. 683, 697, 483 S.E.2d 422, 431 (1997) (citing *Crow*, 319 N.C. at 282-84, 354 S.E.2d at 465-66).

"When all the prerequisites are met, it is left to the trial court's discretion 'whether a class action is superior to other available methods for the adjudication of th[e] controversy.' " *Beroth Oil Co. v. N.C. Dep't of Transp.*, 367 N.C. 333, 337, 757 S.E.2d 466, 470 (2014) (alteration in original) (quoting *Crow*, 319 N.C. at 284, 354 S.E.2d at 466). The trial court has "broad discretion" to allow or deny class certification. *Frost*, 353 N.C. at 198, 540 S.E.2d at 331. Accordingly, we review the trial court's order allowing class certification for abuse of discretion. *See Beroth Oil*, 367 N.C. at 337, 757 S.E.2d at 470 (citing *Faulkenbury*, 345 N.C. at 699, 483 S.E.2d at 432). In *Beroth Oil* we further refined the standard of review applicable to the findings of fact and conclusions of law in the class certification order, concluding that although "the general standard of review is abuse of discretion," the trial court's conclusions of law are reviewed de novo. *Id.* at 338, 757 S.E.2d at 471 (quoting *Blitz v. Agean, Inc.*, 197 N.C. App. 296, 300, 677 S.E.2d 1, 4 (2009), *disc. rev. denied and cert. denied*, 363 N.C. 800, 690 S.E.2d 530 (2010)). The trial court's findings of fact are binding on the appellate court if supported by competent evidence. *Id.* at 338, 757 S.E.2d at 471.

In this appeal defendant argues that class certification is improper. Defendant contends that the trial court found that the "central issue common to all Plaintiffs is whether they are entitled to share in the accumulated assets held by Defendant, which Defendant contends is held as a reasonable reserve." Defendant asserts that this issue involves a challenge to its business judgment and therefore "constitutes a prototypical derivative claim." Defendant states that plaintiffs are barred from bringing a derivative proceeding because they failed to make a written demand upon defendant in compliance with section 55-7-42, which states:

> No shareholder may commence a derivative proceeding until:
>
> (1) A written demand has been made upon the corporation to take suitable action; and
>
> (2) 90 days have expired from the date the demand was made unless, prior to the expiration of the 90 days, the shareholder was notified that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

N.C.G.S. § 55-7-42 (2015). We disagree with defendant's assertion.

A derivative proceeding is defined in pertinent part as "a civil suit in the right of a domestic corporation." *Id.* § 55-7-40.1(1) (2015). Derivative claims belong to the corporation itself, rather than to the plaintiffs, meaning that the rights to be vindicated are those of the corporation, not those of plaintiffs suing derivatively on the corporation's behalf. *See, e.g., Gall v. Exxon Corp.*, 418 F. Supp. 508, 514-15

(S.D.N.Y. 1976). "[A]ny damages flow back to the corporation, not to the individual shareholders bringing the [derivative] action." *Green v. Freeman*, 367 N.C. 136, 142, 749 S.E.2d 262, 268 (2013) (citing, *inter alia*, *Rivers v. Wachovia Corp.*, 665 F.3d 610, 614-15 (4th Cir. 2011)).

Defendant's appeal arises from the class certification order and seeks reversal of that order. Defendant does not argue that section 55-7-42 requires dismissal of any specific claims for relief alleged in the complaint, but contends that section 55-7-42 precludes class certification. Yet, section 55-7-42 establishes when a shareholder "may commence a derivative proceeding," but does not set forth any requirements for class certification. In addition, neither Rule 23 nor this Court's precedents require a court evaluating a motion for class certification to consider whether any claims raised by a putative class action are derivative in nature. N.C.G.S. § 1A-1, Rule 23 (2015); *see also, e.g.*, *Crow*, 319 N.C. at 282-84, 354 S.E.2d at 465-66 (describing the prerequisites for class certification). We conclude that whether or not plaintiffs' claims are derivative in nature, nothing in section 55-7-42 precludes class certification in the case *sub judice*. We express no opinion whether any of these claims are derivative claims and note that defendant may argue that specific claims are barred by section 55-7-42 in a properly raised motion to dismiss. *See, e.g.*, *Allen ex rel. Allen & Brock Constr. Co. v. Ferrera*, 141 N.C. App. 284, 289, 540 S.E.2d 761, 766 (2000) (concluding that the trial court did not err by dismissing the plaintiff's derivative claims pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6)). We hold only that

defendant has not shown that the trial court abused its discretion by allowing the motion for class certification notwithstanding defendant's contention that plaintiffs' action is derivative in nature.

Next, defendant argues that the trial court abused its discretion by certifying the class because there is a conflict of interest between one of the class representatives and other members of the plaintiff class. Specifically, defendant contends that one named plaintiff and class representative, Richard Renegar, is on defendant's Board of Directors. Defendant asserts that allowing Renegar to represent the class essentially amounts to Renegar "inculpating, if not suing, himself" because, by arguing that the Board's recent and current actions are unreasonable or improper, Renegar "effectively" contradicts Board decisions for which he "consistently voted in favor." We disagree.

We explained in *Crow* that one of the prerequisites for class certification is that the class representatives not have a conflict of interest with the other class members. "The named representatives must show that there is no conflict of interest between them and the members of the class who are not named parties, so that the interests of the unnamed class members will be adequately and fairly protected." *Crow*, 319 N.C. at 282, 354 S.E.2d at 465 (citing *Thompson v. Humphrey*, 179 N.C. 44, 58, 101 S.E. 738, 746 (1919)).

The trial court found that Renegar, like other class representatives, was a producer of flue-cured tobacco, was a member of defendant, had signed a marketing agreement with defendant, and had delivered tobacco to defendant. In evaluating whether there were any conflicts between the class representatives and the class members, the trial court noted that plaintiffs had not raised any claims alleging that any individual member of defendant's Board of Directors had engaged in misconduct. In addition, the trial court stated that all "claims against individual directors were voluntarily dismissed" by plaintiffs. The trial court also observed that "the named Plaintiffs have continually exhibited an interest in the outcome of this civil action and have been diligent in their involvement, such that the court is satisfied that the Class representatives will protect the interests of all Class members." The trial court concluded that plaintiffs are adequate class representatives.

Because plaintiffs' claims are against defendant and not against individual directors, there is no sense in which Renegar is "inculpating, if not suing, himself" by participating in this case as a class representative. Although a trial court might review a class representative's other activities and find that these activities create a conflict of interest with class members, here the trial court exercised its discretion and determined that Renegar is capable of representing the interests of class members. We are unable to conclude that the trial court abused its discretion by certifying the class notwithstanding this alleged conflict.

Next, defendant argues that "[t]he trial court erred as a matter of law by disregarding fundamental conflicts that divide the class." Specifically, defendant identifies the following alleged conflicts of interest between the class members: (1) some class members still sell tobacco to defendant, while other class members no longer sell tobacco; (2) some class members have filed a separate action in federal district court stating that their interests are not represented by the current action; and (3) some class members who sold tobacco during years when tobacco was sold at a profit may have claims that other class members lack. Defendant asserts that the class certification order must be reversed because of these conflicts.

We did not state in *Crow* that there can be no conflicts of interest between class members. *See id.* at 282, 354 S.E.2d at 465. Nevertheless, we "caution[ed]" that the list of prerequisites identified in *Crow* should not "be viewed as all-inclusive." *Id.* at 282 n.2, 354 S.E.2d at 465 n.2. The trial court has "broad discretion" in "all matters pertaining to class certification." *Frost*, 353 N.C. at 198, 540 S.E.2d at 331. The court "is not limited to consideration of matters expressly set forth in Rule 23 or in [*Crow*]." *Crow*, 319 N.C. at 284, 354 S.E.2d at 466. Accordingly, nothing prevents the trial court from evaluating potential conflicts of interest between class members and weighing any potential conflicts when exercising its discretion to allow or deny class certification. *See, e.g.*, *Harrison v. Wal-Mart Stores, Inc.*, 170 N.C. App. 545, 554, 613 S.E.2d 322, 329 (2005) (concluding that the trial court did not abuse its discretion when it concluded in pertinent part that it could not "certify a class in which some

putative class members assert that other putative class members caused or contributed to the wrongs asserted and the latter deny the assertion"). The trial court may be in the best position to determine whether any conflicts among class members warrant denial of class certification.

In the case *sub judice* the trial court considered defendant's arguments and rejected them. The trial court concluded that "[a]ll Class members and representatives have a common unified interest in the determination of whether Defendant is retaining more than a reasonable reserve to the detriment of the current and former members." The court noted that plaintiffs are not seeking dissolution of defendant and explained that "[v]arying interests among Class members arising from when and how much tobacco a Class member delivered do not create a conflict concerning Defendant's liability." Instead, the court stated that class members' relative interests could be determined based upon each member's patronage interests.

The court noted that class members who received certificates of interest for participation in the profitable crop years from 1967 to 1973 "would receive only that portion of the net gains for each year that is attributable to the tobacco they delivered for that year." The court stated that "[t]hese amounts have been separately accounted for and maintained in Defendant's records." The court therefore concluded that these members' interests do not conflict with those of other members.

For class members "in the 1982-2004 group," who paid the NNC Assessments that in some years helped to create the surplus money that defendant retained as reserve funds, the trial court noted that "there are no material conflicts . . . because their tobacco and [NNC] assessments are proportionally taken into consideration during the entire period that they are common contributors." Although the court acknowledged that some class members may be entitled to a larger or lesser amount of damages than others depending upon the amount of tobacco delivered and NNC Assessments paid by each individual class member, the court, quoting *Pitts v. American Security Insurance Co.*, 144 N.C. App. 1, 15, 550 S.E.2d 179, 190 (2002), stated that "[a] difference in the amount of damages does not create a material conflict of interest between [a plaintiff] and the other proposed class members."

The trial court did not find that conflicts of interest divide the members of the class. Instead, the court concluded that each class member's share of recovery could be determined fairly based upon that member's patronage interests in defendant. Moreover, the court stated that a class action "will preserve the rights of numerous absent, unnamed Class members." We are unable to conclude that the trial court abused its discretion.

Next, defendant argues that the trial court erred by finding that the class members share numerous common issues of law and fact. Defendant contends that each class member's recovery will depend upon different factors, such as whether the

class member still actively sells tobacco to defendant, the communications the class member received from defendant, the crop years during which the class member produced and sold tobacco, and whether the class member has already redeemed a certificate of interest or received other payments from defendant. Defendant asserts that in *Beroth Oil*, 367 N.C. at 346, 757 S.E.2d at 476, this Court stated that certifying a class of eight hundred property owners would require a trial with "far too many individualized, fact-intensive determinations for class certification to be proper." Defendant argues that here the class is larger and requires determination of a greater number of diverse issues than those referenced in *Beroth Oil*. We disagree.

*Beroth Oil* involved a class of property owners raising inverse condemnation claims against the North Carolina Department of Transportation. 367 N.C. at 333, 757 S.E.2d at 468. The inverse condemnation claims arose from the deleterious effect on their properties of the Transportation Corridor Official Map Act, which imposed certain limits on obtaining a building permit or approving a subdivision plat. *Id.* at 334, 757 S.E.2d at 468. The trial court denied class certification. *Id.* at 336, 757 S.E.2d at 470. In concluding that the trial court did not abuse its discretion, we explained that different parcels of land necessarily were affected differently by the restrictions imposed by the Act. *Id.* at 343, 757 S.E.2d at 474. We observed that "[n]ot all of these 800 property owners have the same property interests and expectations. As the trial court correctly noted, the properties . . . are diverse: 'Some . . . are improved and some are not. Some are residential and others are

commercial.' " *Id.* at 343, 757 S.E.2d at 474 (second ellipsis in original). Our decision was based upon the "discrete fact-specific inquiry" necessary to decide inverse condemnation claims related to the particular restrictions of the Act on numerous different properties with different uses and purposes. *Id.* at 343, 757 S.E.2d at 474.

By contrast, in the case *sub judice* the trial court identified many issues of law and fact that are common to the class. The trial court stated that "all members paid $5 for their stock," that "the material language of the stock certificates is uniform," and that "all members signed a marketing agreement," with the text of the agreements used from 1946 to 1984 being "substantially identical" and the text of the agreements used from 1985 to 2004 also being "substantially identical." The trial court explained that "Defendant's relationship with all members was governed by uniform agreements with the [CCC] and uniform agreements with the auction warehouses." The court noted that the terms of all the certificates of interest were identical. For members who participated in the 1967 to 1973 crop years, each member's "gains . . . were allocated pro rata by year based upon each member's percentage of the consigned pounds of tobacco." For members who paid NNC Assessments, the payments were assessed, kept, transferred, and used in the same way for each member. The court stated that defendant had maintained records showing the proceeds from crop years that created a surplus, including the surplus money retained by defendant from 1967 to 1973, from 1982 to 1984, and from tobacco redeemed after the Price Support Program ended in 2004.

The trial court also identified common legal issues shared by the class, including whether defendant "was required to allocate and identify its total equity to the members on a yearly basis," "breached a fiduciary duty to Plaintiffs," or "breached Plaintiffs' contractual rights." The court stated that all plaintiffs share a common interest in determining whether defendant's reserve funds were and are reasonable. The court concluded that plaintiffs had shown sufficient commonality of interests among the class members. The trial court found that no individual inquiry is necessary to determine whether defendant may terminate the membership of members who do not agree to enter into a current marketing agreement with defendant.

Unlike *Beroth Oil*, in which even the question of whether a specific property owner could raise an inverse condemnation claim required a "discrete fact-specific inquiry," *id.* at 343, 757 S.E.2d at 474, here the same basic questions of fact and law will determine whether defendant is liable to plaintiffs for its actions in retaining surplus money as reserve funds and attempting to remove all the members who would not agree to enter into a current exclusive marketing agreement with defendant. In addition, here the trial court exercised its broad discretion to allow, rather than deny, class certification. We are unable to conclude that the trial court abused its discretion in determining that plaintiffs have demonstrated the existence of a class with a shared interest in common questions of fact and law.

Finally, defendant argues that this class is unmanageable simply because of the large number of tobacco producers who were members of defendant and will be members of the class. But the large number of individuals whose interests are affected by defendant's actions is a key reason cited by the trial court in ruling that a class action is superior to individual litigation. The trial court stated that "the only pragmatically effective way to provide relief under the circumstances of this matter is through certification of a class because each individual class member's damages suffered may be relatively small while the burden and expense of individual litigation would be very high." The trial court noted that a class action "will avoid a multiplicity of lawsuits," prevent inconsistent results, reduce plaintiffs' transaction costs in bringing the action, and "preserve the rights of numerous absent, unnamed Class members." "Class actions should be permitted where they are likely to serve useful purposes such as preventing a multiplicity of suits or inconsistent results." *Crow*, 319 N.C. at 284, 354 S.E.2d at 466. Given the extremely large number of similarly situated class members and the impracticality of requiring them to protect their rights through filing hundreds of thousands of individual lawsuits, we cannot conclude that the trial court abused its discretion by ruling that a class action is superior to individual litigation in this case. Accordingly, we affirm the trial court's order allowing the motion for class certification and remand this case to the trial court for additional proceedings not inconsistent with this opinion.

AFFIRMED AND REMANDED.

Chief Justice MARTIN did not participate in the consideration or decision of this case.