**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1316

SHARP FARMS; ROBERT W. MAY; TUCKER FARMS INC.; WORTHINGTON FARMS, Inc.,

Objectors - Appellants,

v.

TERESA M. SPEAKS; TOBY SPEAKS; STAN SMITH; EDDIE BROWN; ROBERT POINDEXTER; MIKE MITCHELL; ROY L. COOK; ALEX SHUGART; H. RANDLE WOOD; ROBIN ROGERS; DANIEL LEE NELSON,

Plaintiffs – Appellees,

and

U. S. TOBACCO COOPERATIVE INC., f/k/a Flue-Cured Tobacco Cooperative Stabilization Corporation,

Defendant – Appellee.

No. 18-1325

DAN LEWIS,

Potential Intervenor - Appellant,

v.

TERESA M. SPEAKS; TOBY SPEAKS; STAN SMITH; EDDIE BROWN; ROBERT POINDEXTER; MIKE MITCHELL; ROY L. COOK; ALEX SHUGART; H. RANDLE WOOD; ROBIN ROGERS; DANIEL LEE NELSON,

     Plaintiffs – Appellees,

  and

U. S. TOBACCO COOPERATIVE INC., f/k/a Flue-Cured Tobacco Cooperative Stabilization Corporation,

     Defendant – Appellee.

--------

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever, III, District Judge.  (5:12-cv-00729-D)

--------

Argued:  October 31, 2018        Decided:  February 28, 2019

--------

Before GREGORY, Chief Judge, THACKER, and QUATTLEBAUM, Circuit Judges.

--------

Affirmed in part, reversed and remanded by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Thacker and Judge Quattlebaum joined.  Judge Quattlebaum wrote a concurring opinion.

--------

**ARGUED:**  Charles Alan Runyan, RUNYAN & PLATTE, Beaufort, South Carolina, for Appellants.  Gary K. Shipman, SHIPMAN & WRIGHT, LLP, Wilmington, North Carolina, for Appellees Teresa Speaks, et al.  Derek L. Shaffer, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Appellee United States Tobacco Cooperative Inc.  **ON BRIEF:**  Andrew S. Platte, RUNYAN & PLATTE, Beaufort, South Carolina, for Appellants Sharp Farms, Robert W. May, Tucker Farms, Inc., and Worthington Farms, Inc.  John L. Coble, MARSHALL, WILLIAMS & GORHAM, LLP, Wilmington, North Carolina, for Appellant Dan Lewis.  William G. Wright, SHIPMAN & WRIGHT, LLP, Wilmington, North Carolina; Namon Leo Daughtry, DAUGHTRY, WOODARD, LAWRENCE & STARLING, Smithfield, North Carolina, for Appellees Teresa Speaks, et al.  Lee M. Whitman, Tobias S. Hampson, WYRICK ROBBINS, Raleigh, North Carolina; Jonathan Cooper, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Appellee

United States Tobacco Cooperative Inc.

GREGORY, Chief Judge:

This appeal of a class-action settlement concerns a longstanding dispute between U.S. Tobacco Cooperative, Inc., an agricultural cooperative of flue-cured tobacco growers in North Carolina, and a class of plaintiffs consisting of current and former Cooperative members. From its inception in 1946, the Cooperative administered a federal price-support program designed to stabilize tobacco prices for member growers through purchasing their unsold tobacco at a guaranteed minimum price and marketing the tobacco to buyers. With a mixed record of success, the price-support program ultimately came to an end in 2004, when Congress enacted the Fair and Equitable Tobacco Reform Act ("FETRA"). By this point, the Cooperative had accumulated a capital reserve fund of hundreds of millions of dollars generated from the tobacco the members delivered or the fee assessments they paid to the Cooperative as members participating in the price-support program.

On October 31, 2012, the plaintiffs ("*Speaks* plaintiffs") filed a class-action complaint against the Cooperative, seeking a declaratory judgment, distribution of the reserve funds to members, and judicial dissolution of the Cooperative as an alternative form of relief. They argued that after Congress enacted FETRA and the price-support program ended, the Cooperative's primary purpose ceased to exist, and it should be forced to distribute the reserve funds and be judicially dissolved. The parties eventually mediated the case in May 2017 and moved for the district court to certify the class and approve their $24 million settlement as fair, reasonable, and adequate for the class members. The district court did so.

4

But this is not the whole picture. At the time the *Speaks* plaintiffs filed their complaint in October 2012, a parallel class action against the Cooperative was making its way through North Carolina state court. That case was brought several years earlier, and it included a class of member growers (the "*Fisher-Lewis* plaintiffs") who form a subset of the *Speaks* class in this appeal but whose claims to the reserve fund are arguably much stronger than the claims of the *Speaks* plaintiffs. Indeed, a North Carolina court, reviewing a proposed settlement for the *Fisher-Lewis* plaintiffs in 2006, concluded that $76.8 million in relief was not even in the "ball park" of being fair, reasonable, and adequate for class members.

The *Speaks* plaintiffs filed their October 2012 complaint just as the *Fisher-Lewis* plaintiffs were gathering momentum—they had substantially survived a motion to dismiss and moved for class certification before the state court. Acknowledging that the preexisting *Fisher-Lewis* proceedings could affect their case, the *Speaks* plaintiffs then stayed the case for several years while those proceedings played out. During this time, the *Fisher-Lewis* plaintiffs met with more success, achieving class certification and successfully defending against the Cooperative's appeal challenging certification. Within two weeks of the North Carolina Supreme Court's decision affirming class certification, however, the *Speaks* parties began their own settlement negotiations. They reached a tentative settlement for $24 million within five months—a settlement that included the *Fisher-Lewis* certified class and extinguished its claims.

Before this Court are the Objectors-Appellants—*Fisher-Lewis* class members who objected to the *Speaks* settlement—and would-be intervenor Dan Lewis. Lewis contends

5

that the district court abused its discretion in denying his motion to intervene in *Speaks*. Because he filed his appeal with this Court far beyond the 30-day appeal deadline prescribed by statute, we must dismiss his appeal for lack of jurisdiction.

The Objectors claim, at bottom, that they got a raw deal. They first contend that the district court abused its discretion in certifying the *Speaks* settlement class under Federal Rule of Civil Procedure 23(a), arguing that the *Speaks* class counsel and class representatives cannot and did not adequately protect their interests in this case. The Objectors also challenge the district court's final approval of the $24 million settlement as fair, reasonable, and adequate under Rule 23(e). Finally, they argue that the district court erred in denying certain *Fisher-Lewis* class members' attempts to opt out the entire *Fisher-Lewis* certified class from *Speaks*.

We affirm the district court's denial of the attempted group opt-out. But after a careful review of this record—which spans nearly 15 years and 5,000 pages—we cannot agree that the Objectors' interests were adequately protected or that a $24 million settlement is fair, reasonable, and adequate for the class. For this reason, we reverse the district court's order certifying the class and granting final approval of the class-action settlement and remand for further proceedings consistent with this opinion.

I.

A.

*Historical Background*

Created in 1946, U.S. Tobacco Cooperative, Inc. is an agricultural cooperative of flue-cured tobacco growers organized under the North Carolina Cooperative Marketing Act.[1] N.C. Gen. Stat. §§ 54-145 to 54-166. The Cooperative's purpose is to "engage in any activity involving or relating to the business of receiving, grading, processing, drying, packing, storing, financing, marketing, selling, and/or distribution, on a cooperative basis, of flue-cured tobacco or products or by-products derived therefrom of its members." J.A. 345.

Under North Carolina law and the Cooperative's governing documents, the Cooperative may establish a capital reserve. *See* N.C. Gen. Stat. § 54-151(5); J.A. 366–67 (articles of incorporation), J.A. 3200 (1947 bylaws), J.A. 3503–04 (1967 bylaws). In the 1970s, the Cooperative's Board of Directors established such a reserve to "prepare for [] rainy days" in the event federal subsidies ended. J.A. 3963. The plaintiffs in this lawsuit are a class of current and former members of the Cooperative who brought an action for dissolution of the Cooperative and distribution of excess capital reserves.[2] J.A. 262–90.

---

[1] Before changing its name in 2008, the Cooperative was called the Flue-Cured Tobacco Cooperative Stabilization Corporation.

[2] The price-support program was established under a series of federal laws that Congress enacted to protect farmers after the Great Depression. *See generally* Jasper (Continued)

To become a member of the Cooperative, a flue-cured tobacco producer "paid five dollars . . . in exchange for one share of [the Cooperative's common] stock." *Fisher v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 794 S.E.2d 699, 703 (N.C. 2016) ("*Fisher-Lewis*"). According to the Cooperative's governing documents, this common stock could be "purchased, owned or held only by producers who shall patronize the corporation in accordance with uniform terms and conditions . . . and only such persons shall be regarded as eligible members of the corporation." J.A. 346. If the common stock passed to someone ineligible for membership, that person had "no rights or privileges on account of such stock," and the Cooperative could "purchase such stock at its book or par value, whichever is less." J.A. 346–47.

From 1946–2004, the Cooperative administered a federal price-support program for flue-cured tobacco for the benefit of its member growers. Under this program, tobacco producers who could not sell their flue-cured tobacco delivered it to a warehouse, where the Cooperative graded the tobacco and tried to sell it at auction. *Fisher-Lewis*, 794 S.E.2d at 703. "The auction was subject to a minimum price established annually by the United States Department of Agriculture, and the tobacco would not be sold for less than that price." *Id.* If the Cooperative could not sell the tobacco, it "would process and store it, while advancing the minimum price less an administrative fee to the tobacco producer." *Id.* The Cooperative paid the tobacco producers with loans from the

Womach, Cong. Research Serv., *Tobacco Price Support: An Overview of the Program* (Dec. 31, 2005), http://nationalaglawcenter.org/wp-content/uploads/assets/crs/95-129.pdf (saved as ECF opinion attachment; viewed 02/28/2019).

8

Commodity Credit Corporation ("CCC"), an entity owned and operated by the federal government that assisted in administering the price-support program. *Id.* Any unsold tobacco served as collateral for the CCC's loans. *Id.*

During the lifetime of the price-support program, the Cooperative accumulated a reserve of hundreds of millions of dollars from three main sources: (1) the 1967–73 crop years; (2) the 1982–84 crop years; and (3) the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA"), Pub. L. No. 108-357, 118 Stat. 1418. *See Fisher-Lewis*, 794 S.E.2d at 704.

First, during the 1967–73 crop years, the Cooperative "received and stored tobacco . . . and eventually sold the tobacco at a price higher than necessary to repay the loans from the CCC," earning a profit on the resale. *Fisher-Lewis*, 794 S.E.2d at 704. The Cooperative distributed some of these profits to its members in cash and held on to the remainder—about $26.8 million—as reserve funds. *Id.* The Cooperative issued certificates of interest in the reserve on a pro rata basis to members whose tobacco had created the surplus during those years. *Id.*

The second source of the Cooperative's reserve money was the 1982–84 crop years. The Cooperative's profits from this period stem from the passage of the No Net Cost Tobacco Program Act of 1982 ("NNC Act"),[3] which fundamentally changed the structure of the federal price-support system. *See Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106, 1109 (4th Cir. 1984). Before Congress enacted this law, the

---

[3] Pub. L. No. 97-218, 96 Stat. 197.

CCC's loans to the Cooperative were "non-recourse" because "[t]he Cooperative's failure to earn complete repayment funds [from the member growers] would result in a loss to be absorbed by the CCC: the CCC could sell the collateral [i.e., the growers' unsold tobacco] for its own account after the loan had matured, but it otherwise had no recourse against either the Cooperative or the individual farmers." *Id.* This system changed with passage of the NNC Act, which applied starting with the 1982 crop year and required member growers to pay an assessment to the Cooperative at the time they delivered their tobacco to serve as additional collateral for the CCC's loans to the Cooperative, a measure intended to limit the federal government's losses. *Fisher-Lewis*, 794 S.E.2d at 703–04. The Cooperative later used the surplus funds collected from the NNC assessments—funds remaining after the CCC loans had been repaid—to redeem unsold member tobacco from the 1982 crop year that the CCC had held as collateral. *Id.* The Cooperative sold this tobacco and put in the reserve the $110 million in profit that it earned from the sale. The Cooperative did the same for the 1983 and 1984 crop years. J.A. 3966.

Third, the Cooperative added to its reserve fund after Congress enacted FETRA in October 2004 and ended the federal price-support program. *See Fisher-Lewis*, 794 S.E.2d at 704. In implementing FETRA, the CCC called the Cooperative's outstanding loans and took title to the tobacco that had been pledged as collateral for the loans. J.A. 4014. The CCC repaid the loans through selling some of the tobacco as well as taking possession of the NNC assessments and applying them to the loan balance. J.A. 3966–67. The CCC returned the remaining tobacco—about 83 million pounds—to the

10

Cooperative, and the Cooperative eventually sold the tobacco for $81 million, adding this sum to its reserve fund.  J.A. 3966–67; *see also Fisher-Lewis*, 794 S.E.2d at 704.

When the price-support program ended in 2004, the Cooperative began culling its membership rolls as part of an effort to develop a business plan that would enable it to remain financially viable and to continue providing benefits for members at a time when its primary function—administering price supports—had ceased to exist.  J.A. 4708–09.  This membership reduction occurred in two phases.  First, the Cooperative removed about 713,072 members listed on the membership rolls who it determined were deceased, had stopped farming by 1984, or had no financial relationship with the Cooperative.  J.A. 1781, 4709.  Second, the Cooperative removed 89,994 of the remaining 90,840 members who elected not to sign a marketing agreement with the Cooperative for 2005.  J.A. 1781, 2384.  In a letter to members, the Cooperative explained that members who decided to withdraw their membership by declining to sign the marketing agreement were no longer entitled to a share of the capital reserve.

In 2004, the Cooperative had about 800,000 members.  J.A. 4378.  By the time it finished culling the rolls, the Cooperative had eliminated 99% of its membership, reducing the number of members from 803,912 to 846.  J.A. 1781.  This reduction caused the reserve—consisting of more than $300 million—to increase from $427.00 per member to $365,000 per member.  J.A. 1761.

B.

*Parallel Litigation*

There are two main lawsuits relevant to this appeal. First is the *Fisher-Lewis* proceeding in North Carolina state court. The second—this case—is the *Speaks* proceeding in North Carolina federal court. To provide the background necessary for disposing of this appeal, we trace the history of each proceeding through the district court's final approval of the *Speaks* settlement in February 2018.

1.

*Fisher-Lewis (State Court)*

In January 2005, a group of current and former Cooperative members, including appellant and would-be intervenor Dan Lewis, filed a putative class action in North Carolina Superior Court after the Cooperative cancelled their memberships and extinguished their accrued interest in the reserve when they failed to enter into the marketing agreement with the Cooperative ("*Lewis*").[4] J.A. 4451–52. The plaintiffs argued that the Cooperative "expelled hundreds of thousands" of members and asserted control over the reserve fund in a deliberate attempt "to create a 'last man standing' scenario in which a few hundred remaining member[s] potentially have the benefit of hundreds of millions of dollars in assets which have been created through the efforts of all members[s], including [p]laintiffs." J.A. 1827. The plaintiffs were represented by

---

[4] *See Dan Lewis et al. v. Flue-Cured Tobacco Coop. Stabilization Corp.*, No. 05 CVS 188 (N.C. Super. Ct.).

12

Gary K. Shipman and William G. Wright, counsel for the *Speaks* plaintiffs in this case. J.A. 59, 4713.

One month later, in February 2005, another group of farmers filed a similar lawsuit in North Carolina state court ("*Fisher*").[5] These plaintiffs were represented by C. Alan Runyan and Philip Isley, counsel for Objectors and would-be intervenor Lewis. J.A. 4713.

In September 2005, almost nine months after *Lewis* was filed, the *Lewis* plaintiffs, represented by Shipman and Wright, entered into a preliminary settlement agreement with the Cooperative for $76.8 million in cash and $212 million in book allocations. J.A. 311. But the *Fisher* plaintiffs, who would be included in the settlement, objected to these settlement terms, and the state court in May 2006 denied preliminary approval of the settlement without prejudice on the basis that the record was insufficiently developed to resolve outstanding concerns and that the evidence that had been presented "does not support a finding or conclusion that the proposed Settlement is within the necessary 'ball park' of being fair, reasonable and adequate." J.A. 311–12. Given the inadequacy of the record, the court ordered the parties to engage in additional discovery on the merits of the proposed settlement. J.A. 311–12. A few days later, the Cooperative filed a preliminary notice of intent to terminate the proposed settlement. J.A. 4455.

In September 2007, Shipman and Wright moved to withdraw as counsel for the *Lewis* plaintiffs because of disagreements with co-counsel. J.A. 4714. The court granted

---

[5] *See Kay Fisher et al. v. Flue-Cured Tobacco Coop. Stabilization Corp.*, No. 05 CVS 1938 (N.C. Super. Ct.).

13

this motion on October 8, 2007. J.A. 4458. Also in October, the *Lewis* and *Fisher* plaintiffs made a settlement offer for both cases, and the parties began settlement negotiations that extended through July 2008 and included at least one mediation. J.A. 4458.

The *Fisher* and *Lewis* cases were consolidated in May 2009 ("*Fisher-Lewis*"). J.A. 4458. The plaintiffs at this time filed a second amended and consolidated complaint alleging the following fourteen claims for relief: (1) conversion; (2) breach of contract; (3) imposition of a constructive trust; (4) accounting; (5) distribution; (6) declaratory judgment; (7) fraud; (8) in the alternative, fraud in the inducement; (9) ultra vires; (10) breach of contract; (11) breach of contract accompanied by a fraudulent act; (12) unfair trade practices; (13) dissolution; and (14) judicial dissolution. J.A. 1837–52. The Cooperative filed a motion to dismiss in July 2009.

On March 30, 2012, the North Carolina Superior Court granted the motion to dismiss on three of the fourteen claims: fraud, fraud in the inducement, and breach of contract accompanied by a fraudulent act. J.A. 1860–68. The court otherwise denied the Cooperative's motion. On July 9, 2012, the *Fisher-Lewis* plaintiffs filed a third amended and consolidated complaint, dropping the three claims that had been dismissed and removing the claims for dissolution and judicial dissolution. J.A. 1918–52.

Also on July 9, 2012, the *Fisher-Lewis* plaintiffs filed a motion for class certification under Rule 23 of the North Carolina Rules of Civil Procedure. J.A. 1869–1916. The court granted the motion and certified the *Fisher-Lewis* class in February 2014. J.A. 2463–78. The Cooperative appealed this decision, and the North Carolina

14

Supreme Court affirmed the amended certification order on December 21, 2016. *See Fisher-Lewis*, 794 S.E.2d at 703. The certified *Fisher-Lewis* class consisted of the following:

> All individuals, proprietorships, partnerships, corporations, or their heirs, representatives, executors or assigns, and other proper entities that have been members/shareholders of the Flue-Cured Tobacco Cooperative Stabilization Corporation . . . at any time from its inception through the end of crop year 2004, and any heirs, representatives, executors, successors or assigns, and;
>
> (a) had not requested cancellation of their membership and whose membership was cancelled by Stabilization without a hearing, and/or
>
> (b) were issued a certificate of interest in capital reserve by Stabilization for any of the tobacco crop years between and including 1967–1973, and/or
>
> (c) delivered, consigned for sale, or sold flue-cured tobacco and paid an assessment for deposit into the No Net Cost Tobacco Fund or No Net Cost Tobacco Account during any tobacco crop years between and including 1982–2004.

*Fisher-Lewis*, 794 S.E.2d at 704 (alteration in original).

In upholding class certification, the North Carolina Supreme Court concluded that there were no conflicts among this class that would prevent class certification because "each class member's share of recovery could be determined fairly based upon that member's patronage interests in [the Cooperative]"—i.e., each member's profit contribution to the Cooperative's reserve fund. *Id.* at 708.

2.

*Speaks (Federal Court)*

On October 31, 2012, three months after the *Fisher-Lewis* plaintiffs' motion for class certification in state court, a different group of tobacco growers represented by

15

Shipman and Wright—former *Lewis* counsel who withdrew in 2007—filed this lawsuit, a putative class action against the Cooperative in the Eastern District of North Carolina. J.A. 32–70. The *Speaks* plaintiffs brought claims for a declaratory judgment, distribution to members under N.C. Gen. Stat. § 55A-13-02(c), and an alternative statutory claim for judicial dissolution of the Cooperative under N.C. Gen. Stat. § 55A-14-30. J.A. 52–59, 4460. The proposed *Speaks* class encompassed the class certified in *Fisher-Lewis*.

On December 5, 2012, the parties jointly moved for a temporary stay pending the state court's decision on the class-certification motion in *Fisher-Lewis*. J.A. 71–73. The court granted the stay on December 17, 2012. J.A. 74–75. For the next five years, the *Speaks* parties continually sought—and were granted—temporary stays, and they occasionally provided the court with status reports. The Cooperative never filed an answer to the complaint, and no adversarial discovery took place. J.A. 9–14. The parties informed the court during this period that "[r]esolution of the class issues in [*Fisher-Lewis*] continues to be relevant to [p]laintiffs in the action before this Court and, if [d]efendant's anticipated appeal in [*Fisher-Lewis*] is rejected or class certification is upheld on appeal, this federal action may become moot." J.A. 89.

The North Carolina Supreme Court affirmed class certification in *Fisher-Lewis* in late December 2016, and about two weeks later, on January 4, 2017, the Cooperative's counsel contacted Shipman, counsel for the *Speaks* plaintiffs, about scheduling a conference call to discuss next steps in the *Speaks* case given the recent decision in *Fisher-Lewis*. J.A. 4464.

16

The conference call took place on January 9, 2017, and the discussions led to an agreement to mediate the *Speaks* case. J.A. 4464. In the months following the conference call—while the *Fisher-Lewis* parties were developing the notice plan—the Cooperative's counsel and Shipman discussed selection of a mediator and possible dates for mediation, developed a list of relevant documents and exchanged them, and set a date to submit position papers to the mediator. J.A. 4465–68. The parties ultimately selected the Honorable Frank Bullock, a retired federal judge, to mediate a session that would take place on May 11–12, 2017. J.A. 4716.

On April 20, 2017, the Cooperative's local counsel explained in an email to the *Speaks* parties that he had communicated a "courtesy 'heads-up' to Philip Isley [plaintiffs' counsel in *Fisher-Lewis*]" that the parties had scheduled a mediation in *Speaks* for May 11–12 with Judge Bullock. J.A. 4583. Local counsel further stated in his email that "[w]e will let you know if anything gets filed by the [*Fisher-Lewis*] plaintiffs with [the *Speaks* court] concerning the mediation," and he asked the parties to "please let us know if you hear from the [*Fisher-Lewis*] plaintiffs as well." J.A. 4583. This courtesy "heads up" was the first time the *Speaks* parties informed *Fisher-Lewis* counsel that *Speaks* was going to be mediated.

On May 5, 2017, Bob Cherry, counsel for the *Fisher-Lewis* plaintiffs, wrote a letter to Shipman, counsel for the *Speaks* plaintiffs, stating that he had been informed that a mediation had been set for May 11 and reminding Shipman that certain class representatives in *Fisher-Lewis* were Shipman's former clients to whom he owed continuing duties under professional-conduct rules. J.A. 720. Cherry indicated that his

17

letter served as "formal notice" that Shipman's former clients did not consent to his representing the *Speaks* plaintiffs because such a representation "could be materially adverse" to the interests of the *Fisher-Lewis* class. J.A. 720–21. Shipman responded that the mediation would occur as planned, that parallel state–federal class actions are "not unique," and that "both the [*Fisher-Lewis*] case and the *Speaks* case are free to proceed until there is a final judgment in one of them." J.A. 725.

On May 10, the day before the mediation, Cooperative counsel sent an email to Judge Bullock noting the parallel state and federal class actions and stating that *Fisher-Lewis* counsel sent a letter "voicing some concern over the upcoming mediation," concern that Cooperative counsel and Shipman "do not share." J.A. 4585. Cooperative counsel also provided the correspondence between Cherry and Shipman as an attachment to the email.

After two days of mediation, the parties reached a settlement in principle. J.A. 4350. The Cooperative agreed to pay $24 million in exchange for a release of all claims by the class, including the *Fisher-Lewis* claims. J.A. 204.

On September 7, 2017, the *Speaks* plaintiffs filed a motion to certify the class action and for preliminary approval of the proposed class-action settlement. J.A. 122–92. The plaintiffs amended the motion on September 8, filing a stipulation and agreement of class-action compromise, settlement, and release. J.A. 193–250. Five days later, on September 13, 2017, the district court preliminarily approved the settlement and the notice plan and scheduled a final fairness hearing for January 19, 2018. J.A. 251–61.

18

In the months before the hearing, some class members objected to the settlement, including the Objectors-Appellants Sharp Farms, Robert May, Tucker Farms, and Worthington Farms. The Objectors are members of the *Fisher-Lewis* certified class who were included in the proposed *Speaks* settlement class.

3.

*Fisher-Lewis Challenges to Speaks Settlement*

As the parties in the *Speaks* proceedings moved closer to a final settlement in late 2017, the *Fisher-Lewis* plaintiffs protested the *Speaks* settlement and the manner in which it was reached.

On September 15, 2017, a week after preliminary approval in *Speaks* was requested and two days after it was granted, *Fisher-Lewis* class representative Dan Lewis moved to intervene in *Speaks*, contending that the settlement was inadequate primarily because of the earlier settlement valued at $76.8 million in cash and more than $212 million in book allocations, "three times the current settlement amount" in *Speaks*. J.A. 305. On October 2, 2017, the district court denied Lewis's motion to intervene as untimely. The court explained that Lewis had been aware of this lawsuit since at least 2014, and that he knew about the mediation no later than May 5, 2017, but waited to move to intervene until after the court preliminarily approved the settlement. J.A. 1296–99. Lewis subsequently opted himself out of the *Speaks* class as well as purported to opt out the entire *Fisher-Lewis* certified class. J.A. 1603–04.

The *Fisher-Lewis* plaintiffs separately filed several motions in state court challenging *Speaks*. On September 22, 2017, the plaintiffs filed an order to show cause

19

or for sanctions, arguing that the Cooperative's counsel in mediating *Speaks* had violated the court's case management order from April 2017, North Carolina Rule of Civil Procedure 23, and the North Carolina Rules of Professional Conduct. J.A. 744–58. On October 13, the state court denied the motion but nevertheless ordered the Cooperative's counsel to produce to *Speaks* counsel "all communications between it . . . and any member of the class in these consolidated cases." J.A. 1327–28. In explaining this directive, the court noted that "this action has been finally upheld as a certified class by the North Carolina Supreme Court and is now proceeding to trial," and indicated that it was "concerned that the integrity of the class and the administration of justice has been called into question given the history of the case, the unusual facts of representation of both the certified action and the later filed *Speaks* case, in that the initial counsel in one of these consolidated actions is now counsel in the *Speaks* case." J.A. 1327.

On November 28, 2017, the *Fisher-Lewis* plaintiffs filed a motion under North Carolina Rule of Civil Procedure 23(c) for an order finding that "the settlement reached in *Speaks*, insofar as it attempts to bind and preclude this certified [] class, is not approved," and finding that the settlement "was reached in a collusive manner to avoid the jurisdiction of th[e] court to promote an inadequate settlement." J.A. 4499. On January 17, 2018, two days before the final fairness hearing in the *Speaks* case, the *Fisher-Lewis* state court issued a lengthy opinion granting in part the Rule 23(c) motion. J.A. 4447–90. The court concluded that the *Speaks* settlement was not fair, reasonable, and adequate for the *Fisher-Lewis* class, and that counsel for both parties in *Speaks* had violated Rules 4.1 and 4.2 of the North Carolina Rules of Professional Conduct. J.A.

20

4477–89.  The state court found in particular "ample evidence of collusion between the parties in *Speaks* to (a) exclude counsel in [*Fisher-Lewis*] from participation in the settlement of the claims for the class members whom they represent, and [to] [b] mislead the members of the [*Fisher-Lewis*] class as to the true facts of this matter."  J.A. 4487–89.

4.

*Speaks Settlement Approval*

The final fairness hearing in *Speaks* took place on January 19, 2018.  On February 20, the district court issued an 82-page opinion certifying the *Speaks* settlement class and granting final approval of the class-action settlement on the basis that it was fair, reasonable, and adequate for class members.  A week later, on February 27, the court issued an amended final judgment clarifying the opt-out list.

Under the terms of the settlement, the Cooperative will pay into the settlement fund $24 million—less attorneys' fees, costs, and incentive awards, capped at $2 million—over a five-year period to be held in escrow on behalf of the class.  J.A. 4730.  The final settlement class encompasses the following:

> all individuals, proprietorships, partnerships, corporations, and other entities that are or were shareholders and/or members of [the Cooperative] at any time during the Class Period [i.e., June 1, 1946, through the effective date of the settlement in 2018], without any exclusion, including any heirs, representatives, executors, powers-of-attorney, successors, assigns, or others purporting to act for or on their behalf with respect to [the Cooperative] and/or the Settled Claims.

This class definition is broader than the definition of the class certified in *Fisher-Lewis*.  That class included current or former members of the Cooperative from 1946–2004 and tied recovery to whether the class member's patronage resulted in a net gain for

21

the Cooperative and thus contributed to the reserve. By contrast, the *Speaks* settlement, which extinguishes the *Fisher-Lewis* class claims, entitles *all* current or former Cooperative members from 1946–2018 to a portion of the Cooperative's reserve funds irrespective of whether they produced net gains for the reserve. Each member's share of the recovery in *Speaks* is indeed based on two factors unrelated to the patronage concept. *See* J.A. 4730–31 (describing "Group 1" and "Group 2" claims). The first factor is the *number of pounds* of tobacco that the member marketed to the Cooperative from 1946–2018 relative to the total number of pounds from all class members who submit this type of claim (subject to a $15,000 cap). The second factor is the *number of years* the member marketed and sold tobacco relative to the total number of years of all class members who submit this type of claim. J.A. 4730–31. The *Speaks* class structure thus allows a class member to share in the recovery of the reserve funds even if he contributed no profits to the reserve.

On March 21, 2018, the Objectors, represented by *Fisher-Lewis* counsel, appealed the district court's final order approving the settlement and the amended final judgment clarifying the opt-out list. J.A. 4797–99. On the same day, Lewis appealed the district court's order denying his motion to intervene, an order that was entered on October 2, 2017.[6] J.A. 4801–03.

---

[6] Lewis's notice of appeal states that the order denying his motion to intervene was entered on October 20, 2017, but the docket sheet indicates that the order was in fact entered on October 2, 2017. *See* J.A. 16.

## II.

*Analysis*

This case presents three main claims of error. First, would-be intervenor Dan Lewis contends that the district court abused its discretion in denying his motion to intervene. Second, the Objectors argue that the district court abused its discretion in certifying the *Speaks* settlement class under Federal Rule of Civil Procedure 23(a) because the *Speaks* representatives and class counsel cannot and did not adequately represent the distinct interests of the *Fisher-Lewis* class members. Finally, the Objectors contend that the district court abused its discretion in approving the class settlement as fair, reasonable, and adequate under Rule 23(e). We address each contention in turn.

## A.

*Lewis's Motion to Intervene*

In his appeal (No. 18-1325), would-be intervenor Lewis, a *Fisher-Lewis* class representative, contends that the district court abused its discretion in denying his motion to intervene in *Speaks*. Because Lewis's appeal of the order denying his motion is untimely, we must dismiss the appeal.

The district court's denial of a motion to intervene is "treated as a final judgment that is appealable." *Bridges v. Dep't of Md. State Police*, 441 F.3d 197, 207 (4th Cir. 2006); *see also Scott v. Bond*, 734 F. App'x 188, 189 n.2 (4th Cir. 2018). Once the district court enters the order denying intervention, a party has 30 days to file a notice of appeal. *See* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). He "may not await final

judgment in the underlying action" to do so. *United States v. City of Milwaukee*, 144 F.3d 524, 528 (7th Cir. 1998).

Lewis filed his notice of appeal on March 21, 2018, about 170 days after the district court denied his motion to intervene on October 2, 2017. As the Supreme Court recently made clear, "a provision governing the time to appeal in a civil action qualifies as jurisdictional [] if Congress sets the time." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 (2017); *see also Bowles v. Russell*, 551 U.S. 205, 211–12 (2007) (observing "the jurisdictional distinction between court-promulgated rules and limits enacted by Congress"); *United States v. Urutyan*, 564 F.3d 679, 685 (4th Cir. 2009) (recognizing "the jurisdictional nature of *statutory* time constraints"). Because Lewis's appeal of the order denying his motion is governed by the 30-day time period prescribed in 28 U.S.C. § 2107(a), we lack jurisdiction over his untimely appeal and must dismiss it. *See Hamer*, 138 S. Ct. at 17 ("Failure to comply with a jurisdictional time prescription . . . deprives a court of adjudicatory authority over the case, necessitating dismissal[.]").

B.

*Class Certification Under Rule 23(a)*

The Objectors contend that the district court abused its discretion in certifying the *Speaks* settlement class under Rule 23(a). *See Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009) (reviewing a district court's decision to certify a class for abuse of discretion).

"Rule 23(a) requires that the prospective class comply with four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation."

24

*EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014); Fed. R. Civ. P. 23(a). The Objectors challenge only the adequacy of representation in this case, arguing that both *Speaks* class counsel and the class representatives were inadequate. 1 William B. Rubenstein, *Newberg on Class Actions* § 3.52, at 325–26 (5th ed. 2011) ("Although Rule 23(a)(4) provides that a class action may be maintained only if 'the representative *parties* will fairly and adequately protect the interests of the class,' courts have long used Rule 23(a)(4) . . . to scrutinize the adequacy of class *counsel* as well as the adequacy of the class *representatives*." (footnote omitted) (quoting Fed. R. Civ. P. 23(a)(4))).[7] The Objectors also separately challenge the district court's denial of certain *Fisher-Lewis* class representatives' attempts to opt out the entire *Fisher-Lewis* certified class from the *Speaks* settlement.

For the reasons that follow, we conclude that the district court abused its discretion in certifying the settlement class because *Speaks* class counsel and the class representatives cannot and did not adequately represent the *Fisher-Lewis* certified class. We therefore reverse that part of the district court's order certifying the settlement class. We hold, however, that the district court did not err in denying the attempted opt-out of the entire *Fisher-Lewis* class, and we therefore affirm the district court's order in this respect.

---

[7] *See* 1 *Newberg on Class Actions* § 3:72, at 394 (noting that Congress in 2003 "adopted Rule 23(g) that creates an explicit textual mooring for the class counsel analysis[,] but most courts continue to employ the substantive standards generated under Rule 23(a)(4) prior to Rule 23(g)'s adoption in their analysis of counsel's adequacy").

1.

*Adequacy of Class Counsel*

First, the Objectors contend that the district court abused its discretion in certifying the class because *Speaks* class counsel—Shipman and Wright—did not adequately and fairly represent the *Fisher-Lewis* class members who became members of the *Speaks* settlement class. The Objectors argue in particular that the district court "erroneously refused to consider" the *Fisher-Lewis* state court's findings that counsel in *Speaks* colluded to exclude *Fisher-Lewis* class counsel from participating in the settlement mediation and to mislead the *Fisher-Lewis* class members into believing that any *Speaks* settlement would not preclude the *Fisher-Lewis* class claims. We agree.

In its order approving the settlement, the district court concluded that *Speaks* class counsel "fully and adequately represents the settlement class" primarily because "counsel has over twenty-years['] experience litigating class actions and has expended significant resources investigating and pursuing the claims in this action." J.A. 4741–42. Addressing the collusion argument, the court stated that the Objectors "essentially suggest that Judge Bullock was too blind to see collusion at the tip of his nose during the mediation, or that Judge Bullock was part of the collusion," arguments that the court rejected as "insulting" and "baseless." J.A. 4743. The court emphasized that Judge Bullock was "an experienced mediator who served with honor and distinction as a [district judge] for 24 years," and that he "reviewed briefings submitted by the parties and facilitated a two-day intense mediation that resulted in the proposed settlement." J.A.

26

4743. Judge Bullock, in sum, "would not and did not participate in a collusive mediation or permit one to take place in front of him." J.A. 4744.

The district court's reasoning in rejecting the Objectors' collusion argument rests on two flawed premises. First, the court appears to have regarded the allegations of collusion as an attack on the mediator himself and his integrity and intelligence. *See, e.g.*, J.A. 4743 (stating that "[i]f the parties were going to collude or attempt to collude, the last person they would have asked to serve as a mediator is Judge Bullock"); *id.* (asserting that "Judge Bullock is as smart and honorable as the universe is large"); *id.* n.18 (explaining that Judge Bullock "is one of the most highly respected lawyers, judges, and mediators in North Carolina's history"); *see also* Oral Arg. 35:45–36:05 (Cooperative counsel stating that "there were some traces of that, frankly," in response to this Court's assertion that the district court seemed to believe that "the mediator was being accused of collusion when the mediator really didn't have the information in front of him"). The extent of the district court's comments defending the mediator's character suggests that this mistaken assumption was a driving force in the court's rejection of the serious collusion allegations.

Second, the district court's analysis erroneously assumes that the mediator had all the relevant information on the collusion allegations at the time he presided over and facilitated the mediation in May 2017. As an initial matter, and as counsel for the *Speaks* plaintiffs acknowledged at oral argument, the mediator did not have the benefit of the state court's January 2018 order extensively documenting what it deemed counsel's improper and unethical conduct, some of which allegedly occurred *after* the mediation,

27

during the summer and fall of 2017.  *See generally* J.A. 4477–90; *see also* Oral Arg. 24:16–24:37 (*Speaks* class counsel acknowledging that "the mediation was conducted prior to the time of [the state court's] order" and agreeing with this Court's statement that "the mediator was not aware" of the violations identified in the order); *id.* at 35:00–35:07 (Cooperative counsel recognizing the same).  Without the state court's order, the mediator could not consider in his assessment the full extent of the collusion allegations and necessarily relied only on information that the parties conveyed before and during the mediation about events preceding the mediation.  That the mediator was present during the settlement negotiations thus cannot provide the sole basis on which to reject the Objectors' charges of collusion.

Defending the district court's reasoning, the Cooperative emphasizes that a "strong presumption against collusion" applies "[w]hen a reputable mediator . . . oversees settlement negotiations."  Coop. Br. 33 (citing *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 295–96 (5th Cir. 2017), and *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).  In this regard, the Cooperative asserts that "[d]uring the mediation, the parties discussed with Judge Bullock the propriety of proceeding in the face of the relevant correspondence and interplay with *Fisher-Lewis*, including in reference to that litigation's history and the 2005 settlement offer."  Coop. Br. 16.

Even if we could look past the fact that the mediator could not assess the extensive state court findings at the time of the mediation, the record reveals little about the extent to which the mediator understood and evaluated the *Fisher-Lewis* class members' concerns about collusion.  Unlike in the cases the Cooperative cites, for example, the

28

mediator did not testify by affidavit or at the fairness hearing in this case. *See Jones*, 865 F.3d at 295 (affidavit); *D'Amato*, 236 F.3d at 85 (testimony at the fairness hearing). And the primary evidence the Cooperative marshals in support of its position consists of an email from May 10, the evening before the mediation, in which Cooperative counsel notified the mediator of the parallel proceedings, indicated that *Fisher-Lewis* counsel had sent a letter to *Speaks* class counsel "voicing some concern over the upcoming mediation," and explained that neither *Speaks* class counsel nor Cooperative counsel "share[d] those concerns." J.A. 4585. On this record, the Cooperative cannot successfully argue that the mediator's presence ensured that there was no collusion or other improper conduct during the settlement of this case.

For these reasons, the district court abused its discretion in rejecting the possibility of collusion based on the presence of the mediator and concluding that *Speaks* class counsel was adequate under Rule 23(a)(4) without sufficiently grappling with the state court's detailed order setting forth the allegedly collusive conduct. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 234–35 (2d Cir. 2016) ("One aspect of the Settlement Agreement that emphatically cannot remedy the inadequate representation is the assistance of judges and mediators in the bargaining process."), *cert. denied sub nom. Photos Etc. Corp. v. Home Depot U.S.A., Inc.*, 137 S. Ct. 1374 (2017); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252–53 (2d Cir. 2011) (concluding that "an intense, protracted, adversarial mediation," with "highly respected and capable" mediators, "does not compensate for the absence of independent representation").

29

The state court's order, which was before the district court at the time it approved the settlement and is part of the record, found that counsel for both the *Speaks* plaintiffs and the Cooperative committed a series of violations in settling this case. Specifically, the order concluded in part the following:

- The *Speaks* parties "intentionally and deliberately negotiated a settlement that was intended to resolve the claims of the [*Fisher-Lewis*] class after specifically being advised by the only counsel authorized to represent the interests of that class that the *Speaks* plaintiffs did not have the authority to do so nor did they have permission to do so." J.A. 4470 ¶ 71.

- Counsel for the *Speaks* plaintiffs and the Cooperative "violated Rules 4.1 and 4.2 of the North Carolina Rules of Professional Conduct in their communications with the [*Fisher-Lewis*] class members." J.A. 4480 ¶ 103. *See* N.C. Rule of Prof'l Conduct 4.2(a) (providing that "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter"); N.C. Rule of Prof'l Conduct 4.1 (providing that "a lawyer shall not knowingly make a false statement of material fact or law to a third person").

- In drafting the class-action complaint and the amended complaint, *Speaks* class counsel, with Cooperative counsel's knowledge, attempted to "manipulate facts in order to construct and present to the *Speaks* court and public a false narrative as to" the circumstances surrounding the state court's denial of the proposed $76.8 million settlement on the basis that there was insufficient evidence that the settlement was fair, reasonable, and adequate. J.A. 4483 ¶¶ 110–11.

- Counsel for the *Speaks* class, with assistance from Cooperative counsel, drafted and edited "the Long Form Notice in such a way as, at best, to ambiguously state the impact of the settlement on the [*Fisher-Lewis*] class and at worst to intentionally misrepresent" the preclusive effect of the *Speaks* settlement, a violation of Rule 4.1. J.A. 4484–85 ¶ 114.

- The *Speaks* parties' actions in setting up and conducting the mediation without sufficiently notifying *Fisher-Lewis* class counsel "demonstrate a deliberate attempt to exclude [*Fisher-Lewis* counsel] from having any

30

meaningful participation in the settlement of their clients' claims." J.A. 4485–86 ¶ 115.

- "[G]iven the apparent inactivity in *Speaks*, even after the last of the stays in *Speaks*, the *Speaks* case served as a convenient placeholder for [the Cooperative], so as to be able to negotiate with someone other than [*Fisher-Lewis* counsel]. Simply put, . . . [the Cooperative's] counsel has engaged in attorney shopping." J.A. 4488 ¶ 121.

- "[T]here is ample evidence of collusion between the parties in *Speaks* to (a) exclude counsel in [*Fisher-Lewis*] from participation in the settlement of the claims for the class members whom they represent, and [to] [b] mislead the members of the [*Fisher-Lewis*] class as to the true facts of this matter." J.A. 4489 ¶ 126.

- In light of these considerations, "the *Speaks* settlement is not reasonable, fair and adequate" for the *Fisher-Lewis* class members. J.A. 4490.

In approving the settlement, the district court acknowledged the state court's order but did not meaningfully grapple with the court's extensive findings or its conclusions that the *Speaks* parties had engaged in collusive conduct to the detriment of the *Fisher-Lewis* class members and violated Rules 4.1 and 4.2. *See* Oral Arg. 23:46–24:10 (*Speaks* class counsel stating that he "totally agree[s]" that the district court did not specifically mention the ethical violations and conceding that "there is no express discussion about" the violations in the order). Instead, the district court downplayed the state court's order, asserting that the state court "did not have the benefit of the extensive record that this court has to assess the fairness, reasonableness, and adequacy of the proposed settlement." J.A. 4765. The district court also emphasized that the state court's order is a "collateral interlocutory order" that is not binding, and that the order includes no "analysis of the merits of the underlying federal case, which is the most important factor

31

in considering the fairness, reasonableness, and adequacy of the proposed settlement." J.A. 4766–67. Addressing the state court's finding that the class notice was misleading, the district court stated in a footnote that it "disagrees" without elaborating. J.A. 4778 n.32.

The district court, in failing to engage sufficiently with the merits of the state court's findings, did not act as a fiduciary of the class and thus abused its discretion in certifying the *Speaks* settlement class under Rule 23(a). *See Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276, 283 (7th Cir. 2017) ("[W]e have repeatedly stated that district courts should act as the fiduciary of the class, subject to the high duty of care that the law requires of fiduciaries." (citation and internal quotation marks omitted)); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) (stating that "the district court has a fiduciary responsibility to ensure that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately" (citation and internal quotation marks omitted)); *see also* 1 *Newberg on Class Actions* § 3:72, at 394 (explaining that "judges provide the primary oversight of class counsel, and they have long utilized the adequate representation requirement of Rule 23(a)(4) to do so"); 4 William B. Rubenstein, *Newberg on Class Actions* § 13:40, at 427–30 (5th ed. 2014) (explaining the court's fiduciary duty during settlement).

In arguing that the district court did not abuse its discretion, the Cooperative asserts that the state court's findings are not dispositive on collusion. As the Objectors point out, however, "[t]he issue here is not whether the district court was bound by the

32

findings of collusion by the state court . . . but whether the district court failed to require closer scrutiny especially given those findings" and given its duty as a fiduciary to the absent class members. *See Kaufman*, 877 F.3d at 283. The Cooperative further argues that, in any event, the district court "expressly considered the state court's decision, properly found it both legally and factually deficient, and rightly declined to follow it." Coop. Br. 36. To the contrary, the district court's rejection of the state court's order consisted largely of conclusory statements and evinced little sustained evaluation of the serious charges of collusion.

The Cooperative also challenges the state court's order on the merits, arguing that the order "is misconceived in multiple respects." None of these asserted deficiencies, however, undermines our core conclusion that the district court improperly rejected the collusion argument based on the mere presence of the mediator and without adequately addressing the state court's findings.

Under these circumstances, we hold that the district court abused its discretion in certifying the *Speaks* settlement class under Rule 23(a).[8]

---

[8] The Objectors separately argue that the North Carolina Supreme Court's decision affirming class certification in December 2016 should have been granted full faith and credit—and thus should have barred class certification in *Speaks*—because the state court judgment "is final on all issues covered by [] certification." *See* App. Br. 30–31. As the Supreme Court has made clear, however, "[o]rders granting or denying class certification . . . are 'inherently interlocutory.'" *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1706 (2017) (citation omitted). Contrary to the Objectors' assertion, then, the district court did not err in declining to give such an interlocutory order full faith and credit in this case. *See, e.g.*, *Bryan v. BellSouth Commc'ns, Inc.*, 492 F.3d 231, 239–40 (4th Cir. 2007) (holding under North Carolina law that full faith and credit did not require a federal court to give preclusive effect to a non-final and interlocutory state court order); *cf. Matsushita* (Continued)

33

## 2.

### *Adequacy of Class Representation*

The Objectors also argue that the district court abused its discretion because the *Speaks* class representatives cannot adequately represent the class given certain conflicts of interest between the *Speaks* class representatives and the *Fisher-Lewis* class members. This argument also has merit.

"Under the adequacy requirement of Rule 23(a)(4), a district court may certify a class only if the class representative 'will fairly and adequately protect the interests of the class.'" *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(4)). "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 625–26 (alteration in original) (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). "For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'" *Ward*, 595 F.3d at 180 (citation omitted). "A conflict is not fundamental when . . . all class members 'share common objectives and the

---

*Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 369 (1996) (concluding that a federal court may not "withhold full faith and credit from a state-court judgment approving a class-action settlement"—a final judgment on the merits—"simply because the settlement releases claims within the exclusive jurisdiction of the federal courts").

34

same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Id.* (alterations in original) (citation omitted).

The Objectors first contend that conflicts of interest exist between the *Speaks* class representatives and the *Fisher-Lewis* class members because the *Fisher-Lewis* members' interest in the Cooperative's reserve "is tied and traceable to their patronage gains" while in the *Speaks* class all members are entitled to a portion of the reserve funds irrespective of whether they contributed to the reserve through their patronage. *See Fisher-Lewis*, 794 S.E.2d at 708 (stating that "each class member's share of recovery could be determined fairly based upon that member's patronage interests in defendant"). The Objectors thus argue that a conflict exists because the legal theory in the *Speaks* case is not tied to each member's patronage interest and would provide broader relief to the settlement class at the expense of the *Fisher-Lewis* class members with identifiable patronage interests in the reserve. The Objectors separately argue that a conflict exists because the members' legal claims are different. Unlike the *Fisher-Lewis* class, the *Speaks* class seeks recovery based on two weak statutory claims, and these weaknesses, say the Objectors, prejudice the *Fisher-Lewis* class members given their much stronger claims.

We agree with the Objectors, and conclude that the district court abused its discretion in certifying the *Speaks* settlement class given the fundamental conflicts between the *Speaks* class representatives and the *Fisher-Lewis* class members. These conflicts stem from the Cooperative's structure, the manner in which the reserve was

35

established, and the divergent legal theories in which the *Fisher-Lewis* class and the *Speaks* class ground their respective claims.

The vast reserve at the center of these lawsuits exists because of certain members' patronage during the periods of the Cooperative's history from 1946–2004 when the price-support program was profitable. Consistent with the statutory framework for North Carolina agricultural cooperatives, the Cooperative's governing documents recognize that this subset of productive members in effect created the reserve, and the Cooperative thus specifically gave these members a patronage interest in the reserve through providing that any excess reserves would be distributed to them in recognition of their contributions. *See* N.C. Gen. Stat. § 54-130 (explaining that such associations "are not organized to make profits for themselves, as such, or for their members, as such, but only for their members as producers"); *id.* § 54-126 (stating that the "net earnings or losses shall be apportioned among the members in accordance with the ratio [of] each member's patronage" compared to total patronage and defining patronage as a member's "amount of purchases, sales, business, labor, wages or other similar criteria").

For the 1967–73 crop years, a member's interest in the reserves was based on a percentage of his gain. J.A. 2396 (acknowledging that individual member growers contributed the reserves and stating that any excess shall be paid "ratably" to patron contributors); J.A. 2397 (explaining that the "contribution to [reserves]" would be "just the same as if the total of each member's allocation of profit was delivered to him in cash and he returned the established percentage to [the Cooperative] as his pro[-]rata contribution to" the reserve). Because the Cooperative was able to sell the members'

36

tobacco for a profit during these years, it "distributed a portion of the net gains to the growers of these crops . . . as cash patronage distributions" and kept the remaining $26.8 million for the reserve while issuing certificates of interest to these members for their pro rata portion of the undistributed net gains. J.A. 2458.

After the No Net Cost Act became law in 1982, a member's interest in the reserve was based on the individual NNC assessments he paid relative to the total assessments paid during the post-1982 period in which the Cooperative was profitable and building its reserve. J.A. 859. At oral argument on the proposed *Fisher-Lewis* settlement in 2005–2006, counsel for the Cooperative acknowledged that each member's patronage interest was the driving force of this lawsuit. J.A. 1789 ("In this cooperative, as in most cooperatives, any interest in the equity of the co-op, other than upon dissolution, is determined by each member's patronage with the co-op over time, and more importantly, whether that patronage resulted in profits to the co-op."); J.A. 4608 (Cooperative counsel stating in 2010 that the class members' "argument is that these reserves were derived from their patronage, so whether any individual grower has an interest in any particular pot of money depends on whether the grower contributed to growing the tobacco in question that generated those proceeds").

This patronage interest in the reserve fund serves as the *Fisher-Lewis* class members' theory of their case. Their patronage resulted in profits for the Cooperative, they contend, and their corresponding patronage interest was unlawfully extinguished—in violation of statutory cooperative legal principles as well as common law principles like breach of contract—when the Cooperative undertook the membership purge in

37

2004–2005. The members' patronage interests in fact provided the basis on which the state court in *Fisher-Lewis* concluded that there were no conflicts of interest within the class. *See Fisher-Lewis*, 794 S.E.2d at 708 ("The trial court did not find that conflicts of interest divide the members of the class. Instead, the court concluded that each class member's share of recovery could be determined fairly based upon that member's patronage interests . . . .").

The *Speaks* class representatives, by contrast, represent a class consisting of all Cooperative members from 1946–2018 irrespective of whether the members produced any profits for the Cooperative—and thus irrespective of whether they contributed to the reserve fund. The *Speaks* settlement indeed proposes to distribute the reserve money to all members based merely on the number of pounds of tobacco each member marketed to the Cooperative and the number of years the member marketed and sold tobacco. But as the Objectors assert, "[m]embership alone has never been the basis for any interest in Cooperative reserves. It has always been tied pro rata to a member's individual interest in either the tobacco marketed [pre-1982] or the NNC assessment paid [post-1982]." Reply Br. 5 ("Gains have not been paid to, nor interests in the reserve created for, those whose tobacco or assessments did not produce them. From [the Cooperative's] inception in 1946 through 2004, . . . participation in the reserves was restricted to those whose contributions had created them."). As the Objectors' expert explained, the *Speaks* distribution plan "actually tak[es] money away from people who have contributed to net patronage interest" because "[t]he only way that you give money to people who contributed zero – that have zero patronage interest is by taking a dollar away from

38

people . . . who have generated [a] patronage interest," a result the expert characterized as "fairly obviously inequitable." J.A. 3834.

The Cooperative suggests, and the district court found, that no conflict exists because both classes seek to recover "excess" reserves. Coop. Br. 31–32; J.A. 4737. But this reasoning obscures the key distinction between the two classes—the *Fisher-Lewis* class members have taken the position that the *Speaks* class can claim no legal entitlement or recognized interest in any "excess" reserves because they have no earned patronage interest in the reserve based on any profit contribution. *Cf. Ward*, 595 F.3d at 180 (stating that "[a] conflict is not fundamental when . . . all class members 'share common objectives and the *same factual and legal positions*'" (emphasis added) (citation omitted)). The *Fisher-Lewis* class members indeed assert a fundamentally different interest and a different injury from the *Speaks* class representatives: they claim an interest in the reserve tied specifically to the profits they produced for the Cooperative, and an injury tied directly to the deprivation of their patronage interest as a result of the 2004–2005 membership purge. *Cf. Amchem*, 521 U.S. at 625 (stating that a "class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members" (citation omitted)). A settlement involving all Cooperative members would vitiate this interest through awarding to noncontributing members a portion of the reserve funds that the *Fisher-Lewis* class members created.

That the *Fisher-Lewis* class members and the *Speaks* representatives are pursuing different legal claims only underscores the conflict of interest between the two. "Adequacy does not require complete identity of claims or interests between the proposed

representative[s] and the class," but there must be "sufficient similarity of interest such that there is no affirmative antagonism between the representative[s] and the class." 1 *Newberg on Class Actions* § 3:58, at 342–44. The different claims of the *Speaks* representatives and the *Fisher-Lewis* class members reflect their different theories of the case, and these theories are in tension. The *Speaks* class members are pursuing claims for *voluntary* distribution or, alternatively, dissolution precisely because—unlike the *Fisher-Lewis* class members—they can likely claim no legal entitlement to the reserve funds on common law and statutory theories that are grounded in the notion that members' patronage gives them an interest in all profit that the Cooperative has kept as reserves and that the Cooperative has deprived them of this interest.

For these reasons, we hold that the district court abused its discretion in certifying the *Speaks* settlement class in this respect as well.

3.

*Fisher-Lewis Classwide Opt-Out*

The Objectors contend that the district court abused its discretion when it certified the class after rejecting the attempts of certain *Fisher-Lewis* class representatives to opt out the entire *Fisher-Lewis* class from this case. Finding no merit to this argument, we affirm the district court's denial of the class opt-out.

In holding that the *Fisher-Lewis* representatives could not opt out the entire class, the district court first noted that its preliminary approval order "expressly prohibited group or class-wide opt-outs." J.A. 4740. The court then went on to explain that the Due Process Clause prohibits classwide opt-outs because due process "requires that class

40

members be provided notice and an individual choice to proceed as a class member or to opt-out and avoid being bound by a judgment." J.A. 4740. For this proposition the court cited several cases. *See Sloan v. Winn Dixie Raleigh, Inc.*, 25 F. App'x 197, 198 (4th Cir. 2002) ("[C]lass representatives cannot opt out on behalf of other putative class members."); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998) ("There is no class action rule, statute, or case that allows a putative class plaintiff or counsel to exercise class rights en masse, either by making a class-wide objection or by attempting to effect a group-wide exclusion from an existing class. Indeed, to do so would infringe on the due process rights of the individual class members, who have the right to intelligently and individually choose whether to continue in a suit as class members."); *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 412 (2d Cir. 1975) (prohibiting the plaintiff from opting out prospective class members in shareholder suit before they had been given an opportunity to opt out and stating that "[t]he only way to avoid such chaos is to require that opting out of a class action, like the decision to participate in it, must be an individual decision"), *abrogated on other grounds by Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993).

The Objectors recognize that courts have generally held that representatives of a putative class cannot opt out individual members on due-process grounds, but contend that this rule does not apply here because the *Fisher-Lewis* class is no longer putative and has already received notice and been certified. The Objectors argue that "[s]ince the members of the [*Fisher-Lewis*] class had exercised their rights and [chose] to remain in [*Fisher-Lewis*], the class representatives can act to bind those absent class members" and

41

opt out of *Speaks* on their behalf. App. Br. 49–50. According to the Objectors, the class representatives in fact had "the fiduciary duty to represent the legal interests of [*Fisher-Lewis*] absent class members once they had exercised their due process choice to be part of the [*Fisher-Lewis*] certified class." App. Br. 46.

The Objectors cite no authority for the proposition that the *Fisher-Lewis* members' status as a certified class creates an exception to the settled rule that the Due Process Clause reposes only in "*individual class members* . . . the right to intelligently and individually choose whether to continue in a suit as class members." *Hanlon*, 150 F.3d at 1024 (emphasis added). Even though the *Fisher-Lewis* class is certified, the policy concerns that militate against permitting group opt-outs in the putative class context are present here as well—allowing representatives to opt out a group of class members would deprive those members of their due-process right to make that choice for themselves and would "completely gut the class action mechanism as objectors could dismantle any class action by removing groups of plaintiffs." 3 William B. Rubenstein, *Newberg on Class Actions* § 9:49, at 555 (5th ed. 2013).

In the absence of any authority or policy justification, we see no basis on which to conclude that the representatives of the *Fisher-Lewis* certified class can opt out of the *Speaks* case on behalf of the absent *Fisher-Lewis* class members. *See* 3 *Newberg on Class Actions* § 9:49, at 556–57 ("Courts have permitted representative opt-outs only in very rare circumstances, such as when a government official or political subdivision requests to opt out on behalf of its constituents."). As the Cooperative notes, moreover, the Objectors' position presents an unworkable scenario because four of the *Fisher-Lewis*

42

class representatives declined to opt out of *Speaks*. *Compare* J.A. 2463 (*Fisher-Lewis* representatives), *with* J.A. 4794 (*Speaks* opt-outs). Certain *Fisher-Lewis* representatives thus attempted to opt out the entire *Fisher-Lewis* class from *Speaks* even while other representatives elected to remain in *Speaks*.

For these reasons, the district court did not abuse its discretion in rejecting the *Fisher-Lewis* representatives' efforts to opt out the entire *Fisher-Lewis* class from this case.

C.

*Final Settlement Approval Under Rule 23(e)*

Finally, the Objectors challenge the district court's approval of the $24 million *Speaks* class settlement as fair, reasonable, and adequate. This Court affords the district court's decision "substantial deference, reversing only 'upon a clear showing that the district court abused its discretion in approving the settlement.'" *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015) (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975)). We agree with the Objectors that the district court abused its discretion under these circumstances. We therefore also reverse that part of the district court's order approving the *Speaks* class settlement as fair, reasonable, and adequate.

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Before a court may approve a proposed settlement, it must conclude that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P.

43

23(e)(2). In assessing the adequacy of the proposed settlement, courts consider the following factors: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991). The most important factors in this analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses. *See Berry*, 807 F.3d at 614–15.

The Objectors contend only that the district court erred when it concluded that the *Speaks* class claims "are weak[] and the likelihood of recovery if plaintiffs litigated this case to final judgment and final appeal is low." J.A. 4748–49. Specifically, the Objectors argue that the district court improperly viewed the weakness of the claims and the strength of the Cooperative's defenses by reference to the *Speaks* class claims without regard for the much stronger *Fisher-Lewis* class claims. Although a $24 million settlement may be reasonable for the *Speaks* class members, the Objectors assert, this amount is not reasonable for the *Fisher-Lewis* class members who form a subset of the *Speaks* class and whose separate claims are extinguished as part of this settlement.

A high-level comparison of the two cases provides a useful starting point for our analysis. The *Fisher-Lewis* claims arose in 2004–2005, when the Cooperative drastically reduced its membership rolls by 99%—from 803,912 members to 846 members—through removing all members who did not appear on sales bills from 1984–2003 or who

44

declined to sign a marketing agreement with the Cooperative for 2005. J.A. 1781. As the Cooperative stated in a letter to members, anyone whose membership was cancelled lost all accrued interest in the reserve. *See Fisher-Lewis*, 794 S.E.2d at 704. The membership reduction caused the reserve to increase from $427.00 per member to $365,000 for each of the remaining 846 members. J.A. 1761.

Based on these events, the *Fisher-Lewis* plaintiffs brought a consolidated suit in May 2009 alleging a variety of common law and statutory claims against the Cooperative, including breach of contract, conversion, ultra vires, and unfair trade practices. J.A. 1837–54. According to the *Fisher-Lewis* plaintiffs, two related legal theories undergird their claims. The first, as we have explained, relies on cooperative legal principles. J.A. 1802 n.44. The plaintiffs contend that a cooperative, by its nature, cannot make profits for itself and must distribute all net earnings pro rata to members based on their patronage, or profit contribution, to the cooperative. *See* N.C. Gen. Stat. §§ 54-126, 54-130. By retaining a reserve far in excess of what is reasonable—a reserve that exists because of members' patronage—the Cooperative deprives the plaintiffs of their legal interest in the excess portion of the reserve. J.A. 1802 n.44; J.A. 1956 n.7.

The *Fisher-Lewis* plaintiffs' second legal theory is tied specifically to the Cooperative's 2004–2005 membership purge and its decision to expel members who refused to sign the new marketing agreement. *See Fisher-Lewis*, 794 S.E.2d at 704. The plaintiffs argue that the Cooperative "systematically disenfranchise[d] [p]laintiffs and other [members] by purging the membership rolls and eliminating" the plaintiffs as members without a hearing. J.A. 1827. Through these actions, the Cooperative

45

"expelled hundreds of thousands" of members and took control of the reserve in an attempt "to create a 'last man standing' scenario in which a few hundred remaining [members] potentially have the benefit of hundreds of millions of dollars in assets which have been created through the efforts of all" members. J.A. 1827. According to the plaintiffs, this campaign to eliminate members deprived them of their right to participate in the "net earnings" derived from their patronage because the Cooperative took the position that expelled members would lose any accrued interest they had in the reserve. J.A. 1802 n.44.

As the record shows, the *Fisher-Lewis* plaintiffs met with considerable success from 2012–2016. The plaintiffs largely survived a motion to dismiss, achieved class certification, and successfully defended against the Cooperative's challenge to certification before the North Carolina Supreme Court. And these victories all occurred in the wake of the state court's conclusion that the record did not support a proposed settlement consisting of $76.8 million in cash and $212 million in book allocations because such a settlement was not within the ball park of being fair, reasonable, and adequate for the *Fisher-Lewis* class members.

It was only after the *Fisher-Lewis* plaintiffs survived the motion to dismiss and moved for class certification that the *Speaks* plaintiffs filed their complaint in October 2012. Within two months, however, the *Speaks* suit was stayed in deference to the ongoing class-certification proceedings in *Fisher-Lewis*, and the *Speaks* case remained stayed until the North Carolina Supreme Court issued its decision in December 2016 affirming class certification. Shortly after this decision, the *Speaks* parties started

46

settlement negotiations, and they reached a tentative settlement within five months, after having conducted essentially no adversarial discovery and without the Cooperative even having filed an answer to the *Speaks* complaint—a stark contrast to the extensive multiyear process in *Fisher-Lewis*, as the state court properly recognized. *See* J.A. 4488 (observing that the *Fisher-Lewis* plaintiffs filed "two complaints, three amended complaints, participated in class discovery, defended class discovery and merits discovery, substantially survived a motion to dismiss, obtained class certification and successfully defended the same" while the *Speaks* plaintiffs "filed one complaint and, with the input of the [Cooperative], filed an amended complaint, obtained approximately 8 stays of their case, submitted a number of status reports, reviewed documents voluntarily provided by the [Cooperative] then mediated and settled their claims"). The *Speaks* settlement amount was $24 million—another stark contrast with *Fisher-Lewis*, where a $76.8 million settlement was deemed as being not even in the ball park of fair and adequate.

The *Speaks* case also involved claims and legal theories different from—and arguably weaker than—the claims in *Fisher-Lewis*. The *Speaks* plaintiffs contend primarily that after Congress enacted FETRA in 2004 and ended the federal price-support program, the Cooperative's principal function ceased to exist, and it was thus unreasonably and unlawfully failing to distribute to members hundreds of millions of dollars in excess reserves that were not necessary to the Cooperative's continued functions and activities in a post-FETRA environment. The *Speaks* plaintiffs do not

47

assert the *Fisher-Lewis* common law and statutory claims for relief based on the Cooperative's 2004–2005 membership purge and members' lost patronage interest.

Given this history and the differences between the two cases, we agree with the Objectors that the strength of the *Fisher-Lewis* case drove the *Speaks* settlement negotiations, and that the district court erroneously relied on the weaknesses of the *Speaks* claims to justify the $24 million settlement as reasonable for the class when that amount is plainly inadequate for the *Fisher-Lewis* class members.

In evaluating the adequacy of the $24 million settlement, the district court concluded that the *Speaks* claims were weak for the following reasons. First, the *Speaks* plaintiffs provided no authority for the proposition that § 55A-13-02(c)—a statute *authorizing* distributions—*requires* or *forces* the Cooperative to make distributions to members. J.A. 4751. Second, FETRA does not provide the plaintiffs with a basis for relief because the statute's plain language "makes clear that the Cooperative was entitled to retain the proceeds from the sale of the loan tobacco" and because the statute does not create a private right of action. J.A. 4750–51. Third, "[w]ithout statutory or contractual entitlement to relief, plaintiffs' claim concerning unreasonable reserves amounts to a claim that the Cooperative's Board breached their fiduciary duties in failing to distribute reserves." J.A. 4751–52. The plaintiffs have not shown that a fiduciary relationship existed between them and the Board, the court indicated, but even if they could make such a showing, the claim would fall within North Carolina's business-judgment rule. J.A. 4752–53. Fourth, the statutory claim for judicial dissolution under N.C. Gen. Stat.

48

§ 55A-14-30 is weak because, among other reasons, the Cooperative is still carrying out its statutory purpose. J.A. 4754–56.

Despite the district court's thorough analysis of the claims before it, many of the weaknesses identified do not apply to the claims of the *Fisher-Lewis* class members. The *Fisher-Lewis* plaintiffs did not request judicial dissolution of the Cooperative, for example, nor did they seek to force distribution of the Cooperative's reserves under N.C. Gen. Stat. § 55A-13-02(c), which by its terms merely authorizes distributions. *See* N.C. Gen. Stat. § 55A-13-02(c) (providing that "a corporation . . . *may* make distributions to purchase its memberships" (emphasis added)). The *Fisher-Lewis* plaintiffs also make no allegation that FETRA provides a basis for relief. *See* Def.-Appellant's Reply Br., *Fisher v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 2015 WL 275307, at \*19 (N.C. filed Jan. 9, 2015) ("Plaintiffs did not plead any claim under FETRA.").

The district court also reasoned in its analysis that, without a statutory or contractual entitlement to relief, the *Speaks* plaintiffs can allege only a breach-of-fiduciary-duty claim, which would fall within the business-judgment rule. This assessment also proves problematic as applied to *Fisher-Lewis*. First, the *Fisher-Lewis* plaintiffs alleged several statutory and contractual claims for relief not present in *Speaks*, and these claims survived a motion to dismiss—including a business-judgment-rule defense—and were part of the certified case. Second, the state court later ruled that the *Fisher-Lewis* claims were not derivative in nature and expressly left open the question whether the business-judgment rule would apply to the surviving claims. J.A. 4609, 4614 & n.1 (granting partial summary judgment to the plaintiffs on the Cooperative's twelfth

49

affirmative defense, which argued that "plaintiffs' claims are barred for failure . . . to satisfy the requirements of the North Carolina statutes applicable to derivative actions"). For these reasons, the district court's business-judgment-rule analysis applies with considerably less force to the *Fisher-Lewis* claims.

In concluding that the $24 million settlement was adequate, the district court also indicated that the Cooperative's defenses were strong, noting in particular that the "statute of limitations is a substantial barrier to large swaths of plaintiffs' claims." J.A. 4756. Again, this reasoning applies with less force to the *Fisher-Lewis* claims. Those plaintiffs filed suit in early 2005, shortly after being notified in late 2004 of the Cooperative's plan to terminate most of its members and retain their accrued patronage interests. The claims indeed arose precisely because of the Cooperative's 2004–2005 membership purge—the moment when the expelled members lost their interest and the reserve increased to an unreasonable $365,000 per member—and the claims substantially survived a motion to dismiss. J.A. 1866–67 (dismissing only three of the 14 claims, all involving fraud allegations). In fact, the state court expressly rejected the Cooperative's limitations defense at the motion-to-dismiss stage. J.A. 1866. As the Objectors point out, moreover, if anyone had a statute-of-limitations problem, it was the *Speaks* plaintiffs. The two *Speaks* complaints pleaded equitable tolling based on the 2005 *Fisher-Lewis* filings, an acknowledgment that the claims faced a limitations barrier. J.A. 49, 279.

The district court, in approving the $24 million settlement as reasonable, also relied on several faulty premises concerning the proposed $76 million settlement. First, the court asserted that the state court "did not find that the proposed settlement was

50

unreasonable" but rather denied preliminary approval "without prejudice" based on certain plaintiffs' objection that discovery on the merits of the settlement was necessary. J.A. 4759–60. Although the state court did deny approval without prejudice, the court indicated in no uncertain terms that the record before it "d[id] not support a finding or conclusion that the proposed Settlement is within the necessary 'ball park' of being fair, reasonable and adequate" at only $76 million. J.A. 311–12.

Second, the district court, relying on Federal Rule of Evidence 408 and our decision in *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652 (4th Cir. 1988), concluded that a settlement offer does not reflect the relative strength of the plaintiffs' claims on the merits, and that such an offer cannot establish the Cooperative's liability at trial. J.A. 4760. But the $76 million figure was not merely a settlement offer made in the course of the parties' negotiations. *Cf. Fiberglass Insulators*, 856 F.2d at 653 (holding that Rule 408 requires excluding "statements made by attorneys in the course of settling prior related litigation between the same parties"). The figure instead was the basis on which the court, after briefing and argument, denied preliminary approval for the settlement as not fair, reasonable, and adequate for class members. Neither the district court nor the Cooperative points to any authority suggesting that this Court cannot consider the state court's denial in our review of the *Speaks* settlement.

Third, the district court deemed the $76 million proposed settlement from 2005–2006 outdated and irrelevant—and thus an improper benchmark by which to gauge the reasonableness of the *Speaks* settlement—both because the Cooperative's "business strategy from 2005 to 2017 has proven reasonable and beneficial" to members and

51

because the litigation risks "have substantially changed in the Cooperative's favor since 2005." J.A. 4768.

As an initial matter, even assuming the Cooperative can now—in 2018–2019—justify its large pool of reserves based on an evolving business strategy undertaken over the last fifteen years, the *Fisher-Lewis* case turns on the reasonableness of the reserve in 2004–2005, when the Cooperative eliminated 99% of members and extinguished their accrued interest in the reserve. That the Cooperative's circumstances may have changed in more recent years has little relevance for the *Fisher-Lewis* class members and their claims.

As to the increased litigation risks for the *Fisher-Lewis* plaintiffs, the district court cited the Georgia state court's 2014 opinion in *Rigby* as proof that the *Speaks* plaintiffs have a weak case on the merits and would be unlikely to recover more than $24 million if the case were litigated to judgment. *See Rigby v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 755 S.E.2d 915 (Ga. Ct. App. 2014); *see also Rigby v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 794 S.E.2d 413 (Ga. Ct. App. 2016). *Rigby* is another case against the Cooperative, with claims similar to the claims in *Fisher-Lewis*, and the plaintiffs did not recover anything. But the district court relies heavily on *Rigby* without giving due regard to the *Fisher-Lewis* proceedings directly related to this case—the *Fisher-Lewis* plaintiffs largely defeated the Cooperative's motion to dismiss, including challenges based on the business judgment rule and statute of limitations, the plaintiffs achieved class certification and beat back the Cooperative's challenge on appeal, and they secured summary judgment on the Cooperative's derivative defense.

52

For these reasons, the *Rigby* decision does not provide a valid basis on which to conclude that the $24 million settlement is reasonable and that the $76 million proposed settlement has no relevance in our analysis.

In conclusion, the district court stated that although the *Fisher-Lewis* class asserted many state law causes of action not present in *Speaks*, counsel has failed to explain how these causes of action would enable the plaintiffs to obtain relief greater than $24 million "given that each of these claims appears to rest on the same fundamentally flawed allegation that the Cooperative unlawfully retained reserves." J.A. 4768. But as we have explained, the *Fisher-Lewis* claims do not rest on the "same fundamentally flawed allegation," and the *Fisher-Lewis* plaintiffs have detailed at length their separate theory of the case based specifically on the events in 2004–2005.

The Cooperative, for its part, protests that the *Fisher-Lewis* class members have failed to identify the amount of reserves that the Cooperative may reasonably retain for the members' benefit. But any lack of clarity in the record on the exact amount of reasonable reserves is hardly surprising given that this issue was not contested in *Speaks* and full merits discovery in *Lewis* had commenced only in April 2017, a month before the *Speaks* parties mediated the case and arrived at the $24 million figure. J.A. 4465. The Cooperative also seizes on a statement from the Objectors' counsel, made at the fairness hearing in a colloquy with the court, that the recovery could be "zero" if at trial the Cooperative's entire reserve is deemed reasonable. J.A. 4674. Viewed in its proper context, this statement was nothing more than an acknowledgment from counsel that, if plaintiffs' expert determined that the entire reserve was reasonable, it would follow that

53

the plaintiffs could not recover any excess reserves. As counsel made clear in the subsequent exchange—in which he argued vigorously for a robust recovery—this remark was not a concession that the expert *would* find that the entire reserve was reasonable.

Under these circumstances, we conclude that the district court abused its discretion in approving the $24 million settlement as fair, reasonable, and adequate.

## III.

### *Conclusion*

To sum up, we hold that the district court abused its discretion in certifying the *Speaks* settlement class under Rule 23(a) and in approving the final settlement as fair, reasonable, and adequate under Rule 23(e). We dismiss as untimely Lewis's appeal of the order denying his motion to intervene, and we affirm the district court's denial of the attempted class opt-outs.

For the foregoing reasons, we reverse the district court's order certifying the class and approving the final settlement and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*REVERSED AND REMANDED*

QUATTLEBAUM, Circuit Judge, concurring:

Modern class actions are an important innovation in our legal system. They are a rare departure from "a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). When properly employed, class actions efficiently provide consistent outcomes in resolving large numbers of disputes involving common questions of law or fact.

As with many innovations, however, these benefits come with risks.[1] The very features of class actions that provide efficiency and consistency at the same time present serious risks, including the risk of due process violations. For a plaintiff class, absent class members' grievances are litigated not directly by the class members themselves but by class representatives. Defendants in those actions can be sued by a class of hundreds or thousands of people who are relieved of their normal responsibility to file and prosecute their own case. For a defendant class, concerns are arguably even greater with the very real possibility that judgments can be entered against absent defendants without those defendants receiving notice of the underlying action itself. *See* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:46 (15th ed. 2018).

---

[1] One need not look far or long to find current events that illustrate this point. Recent news coverage of social media platforms and the opioid crisis underscore the old truth that innovation can be a double-edged sword.

Rule 23 of the Federal Rules of Civil Procedure is a structural safeguard in our legal system developed to provide the benefits of class actions while simultaneously avoiding the risks associated with them. As a leading commentator on class actions explains, the primary function of Rule 23 "is, through its various parts, to ensure the protection of absent class members' rights and, hence, the justification of the binding effect of the resulting judgment." 1 William B. Rubenstein, *Newberg on Class Actions* § 1:10 (5th ed. 2011). Thus, to appropriately strike this balance of maximizing benefits and minimizing risks, compliance with Rule 23 is necessary.

In this appeal, Objectors challenge a number of the district court's decisions, including several findings regarding the Rule 23 requirements. Addressing those decisions, the majority affirms the district court's denial of attempted class wide opt-outs and dismisses an appeal of an order denying a motion to intervene as untimely. Maj. Op. at 53. The majority reverses the district court's certification and settlement approval decisions, holding that the district court abused its discretion in certifying the *Speaks* settlement class under Rule 23(a) and in approving the final settlement as fair, reasonable and adequate under Rule 23(e). Maj. Op. at 53. I agree that the district court erred on these issues and, therefore, join with the majority in reversing the district court's order. However, I write separately because, although I agree with the result the majority reaches, I reach those results for different reasons.

I.

I first address the district court's finding regarding the adequacy of the class representatives. Because the district court found the class representatives to be adequate

56

when intra-class conflicts existed regarding the patronage theory of recovery, I join the majority in finding that the district court abused its discretion in certifying the *Speaks* class.

In considering the adequacy of the class representatives, we look to Rule 23(a). That subsection requires adequacy of class representatives—along with numerosity, typicality and commonality—for a class to be certified. Although a district court is rightly afforded wide discretion in its adequacy determination under Rule 23(a), this discretion is not absolute or unlimited. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625–28 (1997) and its progeny make clear that a district court abuses its discretion when it finds class representatives to be adequate despite the presence of intra-class conflicts. The concerns about intra-class conflicts relate to the same due process concerns identified above. "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331, 338 (4th Cir 1998).

Decisions from the Supreme Court and this Court provide guidance on the issue of intra-class conflicts. In *Amchem*, the Supreme Court considered whether a settlement class consisting of victims of asbestos exposure satisfied the requirements of Rule 23. 521 U.S. at 591. In considering the requirements of Rule 23(a)(4), the Court emphasized the purpose of the adequacy requirement, noting "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. [A] class representative must be part of the class and possess the same

57

interest and suffer the same injury as the class members." *Id*. at 625–26 (citing *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982)) (internal citation omitted) (internal quotation marks omitted). The Court identified one such intra-class conflict, finding that "[i]n significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." *Id*. at 626. In affirming the decision to decertify the class in part because of this conflict, the Court concluded "[t]he settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Id*. at 627.

*Ortiz v. Fibreboard*, 527 U.S. 815, 856–58 (1999) affirmed the principle established by *Amchem* and further explained its meaning. In yet another asbestos case, the Supreme Court in *Ortiz* considered whether a mandatory settlement class certified under a limited fund theory satisfied the requirements of Rule 23. *Id*. at 821. In considering the fairness of the distribution of the settlement fund among class members, the Supreme Court applied the adequacy principles set out in *Amchem* and identified two types of conflicts within the class. First, reiterating its holding in *Amchem*, the Court identified a conflict between class members with present injuries and future injuries. *Id*. at 856. The Court noted "it is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogenous subclasses under Rule 23(c)(4)(B)." *Id*. Second, the Court identified a conflict between class members related to the value of individual class members' claims. *Id*. at 857. Noting that some class

members necessarily had "more valuable claims" than others, the Court found that this misalignment of interests required subclasses. *Id*. According to the Court, both types of conflict were "well within the requirement of structural protection recognized in *Amchem*." *Id*.

After *Ortiz*, it is clear that *Amchem* extends beyond conflicts between current and future damages. Our Court, a year earlier, recognized this in *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir 1998). There, this Court followed *Amchem* in determining a nationwide class of franchise holders was improperly certified. *Broussard*, 155 F.3d at 337–39. According to this Court, the putative class of franchise holders contained "manifest conflicts of interests," largely driven by class members' diverging interests in the amount and type of recovery. *Id*. at 338. This Court noted, "The interest of former franchisees in damages and of many EDP franchisees in restitution reveals an obvious initial schism within the putative class regarding the appropriate remedy for [the defendant's] alleged wrongdoing." *Id*. In describing the prejudice caused by these conflicts of interests, this Court observed that the "three distinct groups have potentially divergent aims" and that the remedy sought by the plaintiffs "is consistent with–and only with–the aims [of one of the groups]." *Id*. at 339 (internal quotation marks omitted).

*Broussard* also suggests that intra-class conflicts infringe the due process rights not only of absent plaintiff class members but also of defendants. In that case, the presence of intra-class conflict forced the defendant to respond to inconsistent legal theories and damages claims some of which involved individualized considerations. *See id*. at 338 ("[O]ne group of [absent plaintiffs] sought to intervene below and appear as

amici on appeal, claiming their ongoing business relationship with [the defendant] and their interests in the long-term financial health of the company were imperiled by plaintiff's efforts to wring a large damage award out of defendants."). While the defendant in this case did not raise these issues below or on appeal, in the parallel state proceeding it argued that the differences in arguably a less diverse class prevented class certification.[2]

Here, the district court concluded that there were no intra-class conflicts in this case that precluded certification or necessitated subclasses under Rule 23(a)(4). In reaching this conclusion, the district court attempted to distinguish *Amchem*, characterizing the differences in class members as mere differences in damages between class members. Because of that, the district court concluded that the differences in class members did not create diverging interests or a fundamental conflict. The district court noted "[a]ny differences between class members only arise with respect to the amount of damages each member seeks to recover. Such differences do not create adverse or diverging interests." J.A. 4738 (citing *In re Pet Food Products Liab. Litig.*, 629 F.3d 333, 345–46 (3d Cir. 2010) and *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272–73 (3d Cir. 2009)).

---

[2] In pointing out the Cooperative's lack of consistency, I note that this characteristic appears to be contagious in this case. In the parallel state action, the *Fisher-Lewis* class was apparently not limited to patronage members, *see* definition of *Fisher-Lewis* class at *Fisher v. Flue-Cured Tobacco Coop. Stabilization Corp.,* 794 S.E.2d 699, 704 (N.C. 2016), but the class nevertheless argued for certification. It is hard to reconcile that position with the one it takes in this case.

It is clear from the record that the district court gave thoughtful consideration to this issue. However, the district court did not address either *Ortiz* or *Broussard*. Moreover, the pertinent issue—the proper scope of *Amchem*—ultimately is one of law.[3] The majority in effect concludes that the district court applied *Amchem* too narrowly. I agree. In the same way that class certification was improper in *Amchem* because of differences in the timing of payments, in *Ortiz* because of the differences in strength of the class members' claims and in *Broussard* because of inconsistent claims and damages theories and the individualized issues among class members, the patronage theory[4] asserted by some class members makes the class certification improper in this case.[5]

In order to satisfy the requirements of Rule 23(a), *Amchem* and its progeny require a named class representative to be not only common and typical of those of the entire

---

[3] While we should defer to the district court on matters within its discretion, an appellate court need not defer to a district court's error of law. *Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015)

[4] As described by the majority, the most glaring conflict in the class is the conflict between class members with traceable patronage interests in the Cooperative's reserves and those class members without such interests. Class members with patronage interests can trace their interest in the Cooperative's reserves to their individual contributions to the reserves over time, and class members without those patronage interests cannot. Patronage interests accrued over time and largely derived from contributions made during profitable years in the Cooperative's history and from assessments under the No Net Cost Act.

[5] While typicality and commonality are not specifically raised on appeal, the same issues about which the Objectors complain in the class representative argument also apply to those issues. As the Supreme Court has instructed, typicality, commonality and adequacy of class representative often merge into the same or similar analysis. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). That was in fact the case in *Broussard*.

class, but also to adequately represent the interests of all. When those requirements are not met, the due process rights of the absent class members, as well as defendants, are prejudiced and classes should not be certified.

## II.

Turning next to the district court's findings regarding the adequacy of class counsel under Rule 23(g), I agree with the majority that the district court abused its discretion in finding class counsel to be adequate, but for a different reason. In contrast to the majority's approach, if the issue needs to be reached at all, I would simply find that the district court necessarily abused its discretion because it appointed class counsel for a class that was improperly certified due to the presence of intra-class conflicts.

Instead of relying upon the inadequacy of class representatives to conclude that counsel was therefore inadequate, the majority questions the manner in which the district court evaluated the adequacy of class counsel. The majority finds that "the district court improperly rejected the collusion argument based on the mere presence of the mediator" and "did not meaningfully grapple" with the North Carolina court's findings about collusion. Maj. Op. at 30, 32. Respectfully, the record does not support this conclusion, and affording the findings of the district court appropriate deference, I cannot agree that the district court erred in its findings regarding collusion. I write separately on this issue to address my disagreement with the majority's analysis and to illustrate the ways in

which the district court meaningfully grappled with the North Carolina court's findings of collusion.[6]

As an initial matter, the district court carefully considered Objectors' arguments that the North Carolina court orders were binding on its own analysis of the adequacy of class counsel. Regarding the North Carolina court's certification order, the district court correctly concluded that the certification of the *Fisher-Lewis* class did not impact the *Speaks* action. Likewise, the district court correctly concluded that the North Carolina case management order could not limit the parties or counsel in the *Speaks* action. In reaching this decision, the district court noted that the Objectors offered no case law in support of their positions. Finally, the district court concluded that the North Carolina court's interlocutory order dated January 17, 2018 was not binding on its own analysis.

These decisions are not surprising since, in advancing these arguments, the Objectors fundamentally mischaracterized the relationship between the two parallel actions. It is well settled that a parallel action has no effect on a competing action until a

---

[6] While I disagree with the majority on this issue, I in no way minimize the importance of allegations and findings about ethical violations. Compliance with the Rules of Professional Responsibility are fundamental to our profession. My concurrence should not be construed to suggest allegations of ethical misconduct should not be taken seriously or carefully evaluated in the appropriate forum. They should. However, those findings were neither binding on the district court nor necessarily relevant to the district court's adequacy determination here. *See, e.g.*, *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.,* 737 F.App'x 457, 465 n.10 (11th Cir. 2018) ("Although state ethical rules may be relevant to our determination of whether approval of the settlement was appropriate, a violation of state ethical rules is neither necessary nor sufficient to establish a violation of federal Rule 23(g)."). What was and remains relevant is whether the district court considered the objections and, in doing so, made decisions for which there is legal and evidentiary support. As noted above, the district did that here.

final judgment is reached. *See* 3 William B. Rubenstein, *Newberg on Class Actions* §10:33 (5th ed. 2011). That is even true for the certification decision. "A common misunderstanding is that certification of a class in one suit somehow forestalls other related cases; in fact, only the preclusive effect of a final judgment can formally achieve that end and a decision simply certifying a class is not itself a final judgment." *Id*. Simply put, the North Carolina court's interlocutory decisions did not apply to the *Speaks* case.

Turning now to issues raised in the majority's analysis, the record reveals that the district court did not improperly reject the collusion argument based on the mere presence of the mediator and did meaningfully grapple with the North Carolina court's findings about collusion. Regarding the role of the mediator, the district court admittedly viewed the mediator as a factor in rejecting the collusion arguments. As the court noted, the *Speaks* settlement was reached after a mediation led by a well-respected North Carolina mediator. The court correctly cited to authority that stands for the proposition that the presence of an unbiased mediator is some evidence against the presence of collusion. *See Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 295 (5th Cir. 2017), *cert. denied sub nom. Almond v. Singing River Health Sys.*, 138 S. Ct. 1000 (2018) ("The involvement of an experienced and well-known mediator is also a strong indicator of procedural fairness.") (internal quotation marks omitted).

However, the district court's decision on alleged collusion was based on more than the involvement of the mediator. Despite the district court's conclusion about the legal effect of the North Carolina court orders (or lack thereof), the district court nevertheless considered issues they raised concerning the adequacy of class counsel. Specifically,

64

despite the majority's contention to the contrary, the district court considered at length issues raised by the North Carolina court's interlocutory order dated January 17, 2018. Admittedly, the court's treatment of the issues raised by the North Carolina order are not all contained in the same part of the order. However, when the order is considered as a whole, it meaningfully grappled with the North Carolina court's findings cited by the majority on pages twenty-nine and thirty above.

Regarding notice, the district court considered the issue of whether the *Fisher-Lewis* class was adequately notified of the *Speaks* mediation. For the same reasons set forth in the preceding paragraphs, the court found that it was. Specifically, the court rejected "the contention that the Fisher/Lewis class members have some interest, separate and apart, from the interests of the other class members in this case." J.A. 4742.

The district court also considered the issue of whether the notices issued in the *Speaks* case adequately described the effect of the *Speaks* settlement on the *Fisher-Lewis* claims. It reviewed the contents of the actual notices and found the short form notice, the settlement website and the long form notice contained the necessary information about the effect of the settlement. *See* J.A. 4779 ("The long form notice also clearly details how the Speaks action affects the Fisher/Lewis action . . . . The settlement website, which is listed on the short form notice and the media publications, provides additional information about the settlement and the Fisher/Lewis action . . . .").

The district court also considered the relative inactivity in *Speaks* prior to the settlement. It found that while admittedly there was less formal discovery in the *Speaks* case than the *Fisher-Lewis* case, there was extensive information discovery and

65

information exchange. *See* J.A. 4764 ("Here, the parties engaged in informal discovery and class counsel received numerous documents from the Cooperative . . . . The mediation process provided class counsel with sufficient information about the merits of the case.")

Last, the district court considered whether the record contained evidence of collusion. After reviewing the oral arguments made at two hearings and the extensive briefing on this issue, the district court assessed whether actual evidence of collusion had been offered. The court concluded that there was no evidence presented of collusion besides the timing of the *Speaks* settlement.

In sum, the record reveals that the district court erred in appointing class counsel but not in the way the majority suggests. The district court erred in appointing class counsel for a settlement class that should not have been certified to begin with because the class representatives were not adequate. However, its conclusions regarding allegations of collusion were not error.[7] On this issue, the district court applied the law reasonably and based its decision on the record before it.

---

[7] Under the abuse of discretion standard, an appellate court gives "substantial deference" to a district court's certification and settlement decisions, "recognizing that a 'district court possesses greater familiarity and expertise than a court of appeals in managing the practical problems of a class action.'" *Berry*, 807 F.3d at 608 (quoting *Ward v. Dixie Nat'l. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)). In applying this standard, an appellate court may not substitute its own ideas of fairness for the those of district court. *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975). Rather, an appellate court may reverse a district court's certification or settlement decision only when the district court has committed an error of law or a clear error in finding of fact. *Berry*, 807 F.3d at 608.

III.

I turn last to the district court's finding that the settlement was fair, reasonable and adequate. Since the class representatives in this case were not adequate, approval of the settlement was not appropriate in these circumstances. The Supreme Court has found "[a] fairness hearing under subdivision (e) can no more swallow the preceding protective requirements of Rule 23 in a subdivision (b)(1)(B) action than in one under subdivision (b)(3)." *Ortiz*, 527 U.S. at 858–59. In this limited sense, I join the majority in reversing the district court's approval of the settlement. However, I write separately to express my concerns about the majority's reasoning for reversing the district court.

Like a district court's certification decision, a district court's approval of a class action settlement is afforded substantial deference and should be reversed only upon a clear showing that the district court abused its discretion. *Berry*, 807 F.3d at 614.

Significantly, the majority does not find fault with the legal factors the district court considered in reaching its decision. And it does not find fault with the district court in determining the most important of those factors are the relative strength of the plaintiffs' claims and the existence of difficulties of proof or strong defenses. It also does not object to the way the district court evaluated those issues as they relate to the *Speaks* class. Indeed, the majority describes the district court's analysis as thorough.

Instead, the majority finds the district court abused its discretion because, to the majority, many of the weaknesses the district court found with the *Speaks* class claims do not apply to the *Fisher-Lewis* class claims or at least apply with less force. Specifically, the majority contends that the statute of limitations and business judgment rule defenses

67

are less compelling as to the *Fisher-Lewis* class claims than the district court found. The majority then criticizes the district court's reasoning as to why the $76 million settlement offer from 2005 in the *Fisher-Lewis* action did not make the settlement here inadequate and as to why the failure of a case in Georgia with claims very similar to the *Fisher-Lewis* class claims suggested weaknesses of the claims in this case.

In my view, the majority here deviates from reviewing the district court's decisions under the abuse of discretion standard. Instead, it substitutes its judgment for the district court's. The district court evaluated each claim for relief. It considered the defenses faced by the plaintiffs, including the statute of limitations and business judgment rule defenses. It considered and found persuasive a nearly identical action brought in Georgia resulting in no recovery. It considered the $76 million settlement offer in the North Carolina state case in 2005, determining that offer did not mean the settlement here was inadequate because, in its view, the litigation risks surrounding the claims have changed significantly since 2005 in favor of the Cooperative.

The district court also considered the differences between the *Speaks* class claims and the *Fisher-Lewis* class claims. Specifically, the court reasoned:

> [C]ounsel . . . failed to explain at the fairness hearing or anywhere else how including these additional causes of action would provide a route for the Fisher/Lewis plaintiffs to litigate that case through final judgment and final appeal and recover any greater relief than $24 million, given that each of these claims appears to rest on the same fundamentally flawed allegation that the Cooperative unlawfully retained reserves.

J.A. 4768. The court then added "[a]t the fairness hearing, this court asked counsel . . . to discuss the strength of plaintiffs' claims in Fisher/Lewis and Speaks and explain how

68

plaintiffs in either case could recover anything approaching $24 million if they litigated to final judgment and final appeal." J.A. 4770. The district court found the absence of a meaningful response significant.

Reasonable minds could of course differ on the strengths and weaknesses of the *Speaks* class claims. Indeed, if one hundred judges or lawyers were asked their views about the strengths and weaknesses of the claims here and about an appropriate value of the case, there would likely be one hundred different responses. That is why it is critical that we steadfastly adhere to the applicable standard of review. Under the abuse of discretion standard, our inquiry is simply whether the district court identified and applied the appropriate legal principles and whether it based its decision based on evidence in the record. Here, the district court did that. When that occurs, an appellate court should not substitute its judgment for the district court's.

As noted above, I agree with the majority that the order approving the class settlement should be reversed. However, my agreement is based on the adequacy of the class representative issue as described above. My agreement is not based on the district court's evaluation of the fairness and adequacy of the settlement. In my view, the district court carefully considered the appropriate legal issues and based its decision on a reasonable interpretation of the record.

IV.

In conclusion, I join the majority in affirming the district court's denial of attempted class wide opt-outs and in dismissing the appeal of the order denying the motion to intervene. I also join the majority in reversing the district court's order

69

certifying the class and approving the final settlement. While in the end, the majority and

I arrive at the same destination, I arrive by a different path.